# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF COLORADO

| | |
|---|---|
| In re: **D.J. SIMMONS, COMPANY LIMITED PARTNERSHIP**, <br><br> Debtor. <br> Employer Identification Number: 85-0413146 | Case No. 16-11763-JGR <br> Chapter 11 |
| In re: **KIMBETO RESOURCES, LLC.**, <br><br> Debtor. <br> Employer Identification Number: 85-1473314 | Case No. 16-11765-JGR <br> Chapter 11 |
| In re: **D.J. SIMMONS, INC.**, <br><br> Debtor. <br><br><br> Employer Identification Number: 85-0407729 | Case No. 16-11767-JGR <br> Chapter 11 <br><br> *Jointly Administered Under:* <br> **Case No. 16-11763 JGR** |

## BANK OF OKLAHOMA'S OBJECTION TO ADEQUACY OF DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF DEBTORS D.J. SIMMONS COMPANY LIMITED PARTNERSHIP, KIMBETO RESOURCES, LLC AND D.J. SIMMONS, INC. DATED JULY 29, 2016

BOKF, NA, d/b/a Bank of Oklahoma ("**Bank**") by and through its undersigned counsel, hereby files it Objection to Adequacy of Disclosure Statement With Respect to Joint Plan of Reorganization of Debtors D.J. Simmons Company Limited Partnership, Kimbeto Resources, LLC and D.J. Simmons, Inc. Dated July 29, 2016 (this "**Objection**"). In support of this Objection, Bank states as follows:

### I.     Background

1.     On March 2, 2016, three entities filed voluntary petitions pursuant to Chapter 11 of Title 11 of the United States Code (collectively the "**Cases**"). Those Cases are:

      A.     D.J. Simmons Company Limited Partnership ("**Partnership**") Case No. 16-11763 JGR ("**Partnership Case**")

      B.     D.J. Simmons, Inc. ("**Corporation**") Case No. 16-11767 JGR ("**Corporate Case**")

        C.     Kimbeto Resources, LLC ("**Kimbeto**") Case No. 16-11765 ("**Kimbeto Case**").

2.     The Bank is scheduled as the largest creditor in each of the three Cases, with a scheduled total claim in each of the Cases in the amount of $9,156,050, which figure includes scheduled unsecured claims of the Bank in each of the Cases in the amount of $2,956,050.

3.     No committee or trustee has been appointed in any of the three Cases.

4.     The three Cases have not been substantively consolidated.

5.     On July 29, 2016, Debtors filed their Joint Plan of Reorganization of Debtors D.J. Simmons Company Limited Partnership, Kimbeto Resources, LLC and D.J. Simmons, Inc. Dated July 29, 2016 (the "**Plan**") at Docket No. 129 and their Disclosure Statement for the Plan at Docket No. 128 ("**Disclosure Statement**" or "**D.S.**").

6.     On August 5, 2016, the Court entered its Order for Hearing on Disclosure Statement setting a hearing on September 28, 2016, at 3:00 p.m., with objections to the Disclosure Statement to be filed no later than September 16, 2016 (Docket #132).

## II. Legal Authority Regarding Disclosure Statements

7.     A disclosure statement represents the primary source of information for creditors to consult when determining whether to accept or reject a proposed plan, and it is commonly recognized as "a pivotal concept of Chapter 11 reorganization." *See, e.g., Kunica v. St. Jean Financial Inc.*, 233 B.R. 46, 54 (Bankr. S.D.N.Y. 1999).

8.     A disclosure statement should "clearly and succinctly inform the average ... creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 926, 929-30 (Bankr. D. Mont. 1987). This information should include all factors known to the plan proponent that bear upon the success or failure of the plan. *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929-30 (Bankr. D. Colo. 1981).

9.     The primary purpose of a disclosure statement is to give creditors information necessary to decide whether to accept the plan. *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir.1985). Section 1125(b) of the Bankruptcy Code provides that:

> (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets. *Id.*

10. "Adequate information" is defined in 11 U.S.C. § 1125(a)(1) to mean:

"... information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan." *Id.*

11. The types of information that should be included in a disclosure statement include the following:

    A.    The anticipated future of the debtor;

    B.    The source of the information provided in the disclosure statement;

    C.    Information regarding claims against the estate;

    D.    The accounting and valuation methods used to produce the financial information in the disclosure statement;

    E.    Any financial information that would be relevant to creditors' determinations of whether to accept or reject the plan; and

    F.    Information relevant to the risks being taken by the creditors and interest holders.

*See in re Dakota Rail, Inc.*, 104 B.R. 138 (Bankr. Minn. 1989)

### III. Omissions in the Disclosure Statement

12. The Disclosure Statement does not contain adequate information of a kind, and in sufficient detail, to enable a reasonable investor to make an informed decision about the Plan as required by 11 U.S.C. § 1125 for the following reasons:

    **A.**    The Debtors have failed to disclose the accounting and valuation methodology used to come up with the first proposed secured value of the Bank's collateral at $6,109,885. "The Debtors continue to analyze the collateral securing this [Bank] debt and have provided a value of $6,109,885 in their financial projections. D.S. p. 27 Section 2.a.

    **B.**    The Disclosure Statement fails to disclose the Debtor's ultimate valuation of the Bank's collateral. "The Debtors and their new management continue to analyze the value of the collateral securing this debt". D.S. p. 23, Section B. Debtors and their new management believe that this value needs revision". D.S. p. 27, Section "2.a".

C. The Debtors fail to separately set out the assets and liabilities of each of the three Debtors. This is financial information that would be relevant to creditors' determinations of whether to accept or reject the plan. This is necessary because "[T]he Plan is a joint Plan of the Debtors but neither they nor their Estates are being substantively consolidated." D.S. p. 23, Section "C".

An example of this failure is demonstrated by the following statement: "Proceeds from the sale of encumbered assets will be paid to the secured creditor absent its express written consent for the applicable Debtor to otherwise use the proceeds." D.S. p. 2, final paragraph. How can creditors of each debtor know what might be available if they don't know what assets the Debtors believe are unencumbered or the Debtors' estimate of value of such assets?

D. The Debtors fail to provide a separate liquidation analysis for each Debtor. Attached to the Disclosure Statement as Exhibit 3 is a single unified liquidation analysis (Docket. #128-3). There is no attempt to provide a liquidation analysis for each Debtor.

E. The Debtors fail to disclose the specific identity of all of the postpetition directors and officers and their compensation. "The same eight persons or trusts are both limited partners of DJS Co. LP and shareholders and members of DJS, Inc. Board of Directors." D.S. p. 15, Section "C". "The same board of directors and equity security holders for each debtor will continue to serve after the Confirmation Date." D.S. p. 34 section "G". Who are these eight persons or trusts? There is no disclosure of compensation for directors. There is no statement that equity security holders will not receive any distribution or payment of any kind until all creditors are paid in full. See 11 U.S.C. § 1129(a)(5)(A) and (B).

F. The Debtors attempt to preserve the right to pay severance packages to existing management without further disclosure of amounts to be paid or without further approval of the bankruptcy court. "Debtors have historically provided severance packages to outgoing employees, based on a written formula approved by management….Debtors will seek Bankruptcy Court authority for any severance payment approved by its management, applicable Board of Directors, or Interest holders before the Confirmation Date. To the extent these decisions are made after the Confirmation Date, Debtors will make these payments in the discretion and without additional notice or Bankruptcy Court approval." D.S. p. 19, Section 8, second paragraph.

The Debtors need to disclose the amount of anticipated severance payments even if they are to occur after the Confirmation Date. Further, the Debtors need to disclose why "Interest holders" would receive severance payments or make decisions about severance when their interests are contingent. As detailed below, any such payment to Interest holders, or decisions by such Interest holders violate the absolute priority rule.

G. The Debtors fail to disclose whether a severance payment was paid to the former president.

  H. The Debtors fail to disclose the identity of the Proposed Liquidator. "If Class 4 claimants are not paid in full by January 31, 2024, the Debtors' Management will appoint an independent fiduciary, with receivership bankruptcy trustee or similar experience and this individual or entity will wind up remaining property of debtors and make distributions as required by the bankruptcy code or applicable non bankruptcy law. D.S. p. 34, Section "H".

  I. The Debtors lump all joint operating agreements into one class. "Creditors in Class 2 are parties to joint operating agreements and conduct joint operations with one or more debtors." Plan p. 6, section "e.". Debtors must separately classify which joint operating agreements apply to which Debtor.

  J. The Debtors lump all oil and gas royalty and lease payment claims into one class. "Creditors in Class 2 are parties to joint operating agreements and conduct joint operations with one or more debtors." Plan p. 6, section "f". Debtors must separately classify which oil and gas royalty and lease payment claims apply to which Debtor.

  K. The Debtors include a long section reserving the right to object to claims (D.S. p. 20 section 9 b.). The Debtors fail to disclose that the time period for the Debtors to object to the Bank's claim has expired per the terms of a final cash collateral order. Further the Debtors fail to disclose that the time period for any other person to object to the Bank's claim has expired per the same cash collateral order.[1]

  L. Further, questions arise as to how much one Debtor entity may be charging the other debtor entities for management fees during the seven year period of the Plan. The Statement of Financial Affairs shows that the Corporate debtor received $1,800,00 and $450,000 from the Partnership debtor during the year prior to the Petition Date. Are those payments going to continue to accrue post confirmation? If so on what basis?

  M. There is also significant financial activity with an insider entity that has not filed bankruptcy. Early in 2016, the Partnership apparently received over $400,000 in distributions from Twin Stars. The Disclosure Statement does not discuss such future anticipated receipts by the Partnership or commit to using such income to fund the Plan. What are these funds going to be used for?

  N. Finally, the Debtors have represented in several cash collateral motions that it was essential and necessary to the Debtors' continued survival to expend funds for "Well Project Costs". These costs apparently related to regulatory required capping and abandoning of non-producing wells. The Disclosure Statement fails to detail what Well Project Costs have been incurred or which wells have been successfully and completely capped and abandoned during the six months these Cases have been pending, or a proposed schedule for capping and abandoning wells during the seven year period of the Plan. Such information is necessary to evaluate the feasibility of the proposed Plan.

---

[1] The debtors address the provisions of three interim cash collateral orders, but do not disclose the terms of the final order, which was entered after the current Disclosure Statement was filed.

{Z0132637/1}  5

### IV. The Disclosure Statement is Not Adequate Because The Debtors' Plan on its Face is Unconfirmable.

13. The presence of elements of a proposed plan that render a plan not confirmable is an appropriate basis for an objection to a disclosure statement, as approval of a disclosure statement for a plan that cannot be confirmed is unwarranted. *See, e.g., In re Phoenix Petroleum, Co.*, 278 B.R. 385,394 (Bankr. E.D.Pa. 2001) (citations omitted). All the more so, a disclosure statement cannot be approved if the proponent's plan is unconfirmable on its face. *Calif. Fed. Reserve Bank v. Moorpark Adventure (In re Moorpark Adventure)*, 161 B.R. 254, 258 (Bankr. C.D. Cal. 1993) (denying debtor's motion to approve disclosure statement "in view of this court's determination that the Debtor's Plan is not confirmable"); *see also In re Atlanta West VI*, 91 B.R. 620 (Bankr. N.D. Ga. 1988).

14. A court may refuse to approve a disclosure statement when it is apparent that the plan which accompanies the disclosure statement is not confirmable. *In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr.N.D.Ill.1987), aff'd, 80 B.R. 448 (N.D.Ill.1987); *In re Pecht*, 53 B.R. 768, 769–70 (Bankr.E.D.Va.1985); *In re McCall*, 44 B.R. 242, 243–44 (Bankr.E.D.Pa.1984); *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832–33 (Bankr.D.S.D.1984); *In re Genesee Cement, Inc.*, 31 B.R. 442, 443–44 (Bankr.E.D.Mich.1983).

15. This is to avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the proposed plan when the plan is unconfirmable on its face. Such an exercise in futility only serves to further delay a debtor's attempts to reorganize. "Consideration of whether a debtor's plan satisfies the requirements of 11 U.S.C. Section 1129 is generally addressed at confirmation, however in order to conserve judicial resources and debtor's estate, the court should consider certain provisions of the proposed plan in connection with these objections. Allowing a facially nonconfirmable plan to accompany a disclosure statement is both inadequate disclosure and a misrepresentation." *In re Dakota Rail, Inc.* 104 B.R. 138, 143 (Bankr. Minn. 1989).

### A. The Plan On Its Face Violates the Absolute Priority Rule.

16. The Debtors and existing equity holders propose to remain in control of their assets for a period of seven years during which creditors will remain unpaid. "Class 4 claimants will be paid 1% of their Allowed Claim every other year starting in January 2018, with a final balloon payment in seven years". D.S. p. 29 section "g." "Equity interest Holders retain their interests…" D. S. p. 25, Class 5 description. "…current equity will retain its Interest in the Reorganized Debtors." D.S. p. 29, section "h.".

17. The Plan fails to pay interest on the unsecured claims. This means that equity unsecured creditors are keeping equity while forcing unsecured creditors to wait seven years for payment in full, and with no interest. This violates the absolute priority rule.

18. Further, the Plan provides that all assets will vest in the debtors free and clear of interests on the "Effective Date" not at the end of seven years. "Except as otherwise provided in the Plan, on the Effective Date, all property of each Estate shall vest in the applicable

Reorganized Debtor and be free of all Claims, Liens, charges, encumbrances, **rights** and interest of creditors **and equity security holders**. D.S. p. 34 Section XI A.

19. First of all, this disclosure is inconsistent with, and more broad than, the actual provision in the Plan which reads as follows: "Except as otherwise provided in the Plan, on the Effective Date, all property of each Estate shall vest in the applicable Reorganized Debtor and be free of all Claims, Liens, encumbrances and interests other than the Allowed Secured Claims." Plan, p. 8.

20. Further, the Plan proposes to make payments to unsecured creditors before the secured creditor is paid in full, further violating the absolute priority rule.

### B. The Plan On Its Face is Not Fair and Equitable.

21. The Plan proposes to fix the secured value of the Bank's claim at approximately $6,100,0000. D.S. p. 27, Section 2.a. The Plan then proposes to pay only $200,000 per year in principal on that secured amount. *Id*. That represents a three percent reduction in principal each year. Such reduction translates into a *thirty year* amortization. Along with this thirty year amortization, the Debtors propose to pay interest at the rate of 4.5 percent per year.

22. The Debtors want to transform this admittedly high risk multi-million dollar energy loan into the equivalent of thirty year home mortgage loan, but without any equity cushion that would be required of a homeowner. In a commercial context, in the high risk field of oil and gas, such a proposal is neither fair nor equitable to the Bank.

23. Further, the Disclosure Statement does not reveal how Debtors will be able to pay a $5,000,000 balloon payment on the Bank's secured debt at the end of five years. The Debtors fail to disclose that their wells suffer an admitted decline in production of between seven and eight percent per year. At the end of five years, the Debtors will have depleted between 35% and 40% of their resources and still owe $5,000,000 on the Bank's secured claim.

24. At the end of seven years the Debtors will have depleted between 49% and 56% of their resources. The Debtors need to disclose how they propose to pay a balloon payment of no less than $3,160,000 (the Bank's deficiency claim under the Plan) plus whatever other unsecured claims there are. "Debtors estimate that the Bank of Oklahoma's deficiency claim is more than $3 million." D.S. p. 14, section 5. How do the Debtors plan to pay this deficiency?

WHEREFORE, for the foregoing reasons Bank of Oklahoma requests the Court deny approval of the Disclosure Statement filed by the Debtors.

//

//

//

Respectfully submitted this 16th day of September, 2016.

        MARKUS WILLIAMS
        YOUNG & ZIMMERMANN LLC

        */s/ Donald D. Allen*
        Donald D. Allen, #10340
        1700 Lincoln Street, Suite 4550
        Denver, Colorado 80203-4505
        Telephone (303) 830-0800
        Facsimile (303) 830-0809
        Email: dallen@markuswilliams.com
        ***Attorneys for BOKF, NA, d/b/a Bank of Oklahoma***

## CERTIFICATE OF SERVICE

      I hereby certify that on this 16th day of September, 2016, I caused a true and correct copy of the foregoing **OBJECTION TO ADEQUACY OF DISCLOSURE STATEMENT** to be placed into the United States mail, first class postage prepaid and correctly addressed as follows:

**Ethan Birnberg**
600 17th St., Ste. 1800 South
Denver, CO 80202
ebirnberg@lindquist.com
*Attorney for Debtors*

**James A. Askew**
320 Gold Ave., SW, Ste. 300A
Albuquerque, NM 87102
*Attorney for Four Corners Community Bank*

**Alison Goldenberg**
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO 80294
Alison.Goldenberg@usdoj.gov
*Attorney for US Trustee*

      *s/ Jenny F. Tokuoka*