# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| D.J. SIMMONS COMPANY | ) | Case No. 16-11763-JGR |
| LIMITED PARTNERSHIP | ) | |
| EIN: 85-0413146, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| KIMBETO RESOURCES, LLC | ) | Case No. 16-11765-JGR |
| EIN: 85-0473314, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| D.J. SIMMONS, INC. | ) | Case No. 16-11767-JGR |
| EIN: 85-0407729, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | **Jointly Administered as** |
| | ) | **Case No. 16-11763-JGR** |

---

## AMENDED DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF DEBTORS D.J. SIMMONS COMPANY LIMITED PARTNERSHIP, KIMBETO RESOURCES, LLC, AND D.J. SIMMONS, INC., DATED OCTOBER 24, 2016

---

John C. Smiley, Esq.
Ethan J. Birnberg, Esq.
Lindquist & Vennum L.L.P.
600 17th Street, Suite 1800 South
Denver, Colorado 80202
(303) 573-5900

*Counsel for the Debtors-in-Possession*

DOCS-#5579684-v3

# TABLE OF CONTENTS

I. INTRODUCTION AND PURPOSE......................................................................... 1

II. OVERVIEW OF THE PLAN AND ITS STRUCTURE ...................................... 5

III. GENERAL DISCLAIMERS AND INFORMATION....................................... 7

IV. THE PLAN CONFIRMATION PROCESS .......................................................... 8
    A.    Who May Vote to Accept Or Reject the Plan. ........................................ 8
        1.    Allowed Claims and Interests. ..................................................... 8
        2.    Impaired Claims and Interests. ................................................... 9
    B.    Votes Necessary to Confirm the Plan. ..................................................... 9
    C.    Confirmation Hearing. .............................................................................. 10
    D.    Cramdown: Treatment of Non-Consenting Classes. ............................. 10

V. INFORMATION REGARDING VOTING IN THIS CASE ............................. 11
    A.    Voting Instructions...................................................................................... 11

VI. WHO MAY OBJECT TO PLAN CONFIRMATION ...................................... 12

VII. DESCRIPTION OF THE DEBTORS' BUSINESS, EVENTS LEADING TO THE
    CHAPTER 11 FILINGS, AND SIGNIFICANT EVENTS IN THESE
    CHAPTER 11 CASES .................................................................................... 12
    A.    Description of the Debtors' Businesses and Assets. ............................ 12
    B.    Description of the Debtors' Major Liabilities. ...................................... 13
        1.    Prepetition Credit Agreement. ................................................... 13
        2.    Purchase of Real Property and Remodel of Office Building. .................. 14
        3.    Crane Living Trust and Adams Revocable Trust Secured Claim. ........... 14
        4.    Oil and Gas Royalty and Lease Payments. ................................ 15
        5.    Other Unsecured Liabilities. ...................................................... 15
        6.    Intercompany Claims. ................................................................. 15
        7.    Hedge Agreements........................................................................ 15
        8.    Joint Operating Agreements. ...................................................... 16
    C.    Debtors' Board and Management. ............................................................ 16
    D.    Events Leading to the Chapter 11 Filing. ................................................ 17
    E.    Significant Events During the Chapter 11 Cases. .................................. 18
        1.    Continuation of Business. ............................................................ 18
        2.    Joint Administration of All Three Cases. ................................... 18
        3.    Postpetition Developments. ......................................................... 18
        4.    Cash Collateral Motion. ............................................................. 18
        5.    Retention of Professionals. ......................................................... 19
        6.    Extension of and Debtors' Right to, Assume or Reject Executory
            Contracts. .................................................................................... 19
        7.    Sale of Assets to Bakken Salvage and Coleman Oil and Gas.................. 20
        8.    Settlement with WPX and Transfer of Lease and Ownership
            Interest.......................................................................................... 21
        9.    Anticipated Future Events........................................................... 21

ii

       10.     Claims. ................................................................................. 22

       11.     Avoidance Actions. ............................................................... 23

VIII. SUMMARY OF MATERIAL PLAN PROVISIONS ......................................... 24

    A.    Designation of Classes and Treatment of Claims and Interests Generally. .......... 24

    B.    Distinction Between Secured Claims and Unsecured Claims and Valuation of Collateral. ................................................................................. 24

    C.    Summary of Classification and Treatment of Claims and Interests Under the Plan. ................................................................................. 25

       1.     Allowance and Treatment of Unclassified Claims. ................................. 27

       2.     Allowance and Treatment of Classified Claims. ..................................... 29

IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 31

X. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ........................... 33

    A.    Funding of the Plan. ................................................................................. 33

    B.    Post-Confirmation Operations. ................................................................ 33

    C.    Vesting of Assets Generally. ................................................................... 33

    D.    Preservation/Vesting of Rights of Action. ................................................ 33

    E.    Claim Objections. ................................................................................... 34

    F.    Distribution of Property Under the Plan. .................................................. 34

       1.     Manner of Cash Payments Under the Plan. ........................................... 34

       2.     No De Minimis Distributions. ............................................................. 35

       3.     No Distribution Regarding Disputed Claims. ........................................ 35

       4.     Delivery of Distributions and Undeliverable/Unclaimed Distributions. ................................................................................... 35

    G.    Setoff, Recoupment and Other Rights. .................................................... 36

    H.    Management of the Reorganized Debtors. ................................................ 36

    I.    Appointment of Liquidator. ..................................................................... 36

    J.    Post-Confirmation U.S. Trustee Fees and Professional Fees. ..................... 37

XI. EFFECT OF CONFIRMATION OF THE PLAN ................................................... 37

    A.    Revesting of Assets. ............................................................................... 37

    B.    Binding Effect of Plan/Full Satisfaction and Release of Claims/Discharge of Debtors. ........................................................................ 37

    C.    Compromises and Settlements. ................................................................ 38

    D.    Releases and Related Matters. ................................................................. 38

    E.    Permanent Injunction. ............................................................................ 38

    F.    Environment Issues and Discharge or Injunction Related to Governmental Unit "claims". ............................................................... 38

XIII. FINANCIAL PROJECTIONS AND FEASIBILITY ............................................ 39

XIV. LIQUIDATION ANALYSIS AND "BEST INTERESTS" TEST ............................ 40

XV. RISKS .......................................................................................................... 40

    A.    Certain Bankruptcy Considerations. ........................................................ 41

       1.     Undue Delay in Confirmation May Significantly Disrupt the Operation of the Debtors. ............................................................... 41

|  | 2. | The Debtor May Object to the Amount, Security or Priority Status of a Claim. | 41 |
| B. | | Risks Related to Reorganized Debtors' Business and Financial Condition | 41 |
|  | 1. | Financial Forecasts. | 41 |
|  | 2. | Natural Gas and Oil Price Declines and Volatility Could Adversely Affect the Reorganized Debtors' Income. | 41 |
|  | 3. | The Oil and Gas Industry Has Numerous Operating Risks. | 42 |
|  | 4. | The Oil and Gas Industry is Subject to Regulation. | 42 |

**XVI.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ... 42
| A. | Liquidation under Chapter 7. | 43 |
| B. | Alternative Plan of Reorganization. | 43 |
| C. | Dismissal. | 43 |

**XVIII.** TAX CONSEQUENCES OF THE PLAN ... 43

**XIX.** RECOMMENDATION AND CONCLUSION ... 44

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit 1:    Historical and Current Financial Information

The Debtors' most recent financial statements issued before bankruptcy are set forth in <u>Exhibit A</u>.

The most recent post-petition operating report filed since the commencement of the Debtors' bankruptcy cases is set forth in <u>Exhibit B</u>.

Exhibit 2:    Projected Financial Information

Exhibit 3:    Liquidation Analysis

Exhibit 4:    List of Avoidance Actions

Exhibit 5:    Schedule of Assumed Contracts and Leases and List of Joint Operating Agreements, Oil and Gas Leases, and Executory Contracts

Exhibit 6:    List of Equity Holders

Exhibit 7:    Proposed Distribution to Unsecured Creditors

iv

# I.    INTRODUCTION AND PURPOSE

On March 1, 2016 (the "Petition Date"), D.J. Simmons Company Limited Partnership ("DJS Co. LP"), Kimbeto Resources, LLC ("Kimbeto"), and D.J. Simmons, Inc. ("DJS, Inc.") (jointly, the "Debtors," each entity is a "Debtor," and they collectively operate the "Estates"), each filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.[1] Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties and assets as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code. On October 24, 2016, the Debtors[2] filed their Amended Plan of Reorganization, which accompanies this Disclosure Statement, to provide for the reorganization of the Debtors' estates and the payment of their creditors' claims.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor-in-possession reorganizes its business and financial affairs for the benefit of the debtor, its creditors and other parties in interest. The principal purpose of a chapter 11 case is the formulation of a plan of reorganization. The chapter 11 plan sets forth the means for satisfying the claims of creditors against, and the interests of equity security holders in, each debtor.

The commencement of a chapter 11 case creates an "Estate" comprising all the legal and equitable interests of the Debtor in property as of the Petition Date. Unless the Bankruptcy Court orders the appointment of a trustee, a chapter 11 debtor may continue to operate its business and control the assets of its estate as a debtor-in-possession. The filing of a chapter 11 case also triggers the automatic stay, which is set forth in section 362 of the Bankruptcy Code. The automatic stay halts, among other things, all attempts to collect prepetition claims from a debtor or to otherwise interfere with a debtor's business or its Estate.

The Debtors are the proponents of *Amended Joint Plan of Reorganization of Debtors D.J. Simmons Company Limited Partnership, Kimbeto Resources, LLC, and D.J. Simmons, Inc., Dated October 24, 2016* (the "Plan"). The document you are reading is the "Disclosure Statement" for the Plan. The Plan sets forth the manner in which the Claims against and Interests in the Debtors will be treated in conjunction with Debtors' reorganization under chapter 11. The Disclosure Statement describes the Debtors' prior business operations, the principal terms of the Plan, and assists you in having sufficient information to decide how to vote on the Plan.

Debtors collectively engage in the acquisition, exploration, and development of oil and gas properties, and are primarily focused on extracting proved hydrocarbon reserves from those properties. Debtors have oil and natural gas reserves from approximately 100 wells operated by

---

[1] All references to the "Bankruptcy Code" refer to Title 11 of chapter 11, United States Code.
[2] Where a particular word (such as "Debtor") or term (such as "Allowed Claim" or "Allowed Interest") is capitalized in this Disclosure Statement, and not otherwise defined herein, that word or phrase has the meaning provided in Section V (Definitions) of the Plan. Where, however, a particular word (such as "debtor") or phrase (such as "allowed claim" or "allowed interest") is not capitalized in this Disclosure Statement, that word or phrase is not intended to refer to the definitions provided in Section V of the Plan. Rather, the word or phrase is intended to have the general meaning ascribed to it in common bankruptcy practice parlance.

DJS, Inc., and 500 wells operated by third parties in Colorado, New Mexico, Utah, and Texas. Kimbeto owns 13 wells in Rio Arriba County, New Mexico. DJS, Inc., also operates the wells owned by Kimbeto. DJS Co. LP holds most of the oil and gas and other assets. Kimbeto holds oil, gas, and other related assets on land owned by the Jicarilla Apache Tribe. DJS, Inc, operates the assets and employs a small administrative staff. The chart following this section shows the structure for the D.J. Simmons entities.

Declining gas and oil prices were the primary cause of certain defaults under the Debtors' loans with their largest secured lender, BOKF, N.A. d/b/a Bank of Oklahoma, formerly Bank of Oklahoma, NA (the "Bank of Oklahoma"). To restructure their debt and deal with other issues including the decline in prices, the Debtors elected to file their chapter 11 cases to preserve going concern value and to propose a plan for repayment over time to creditors.

The Plan calls for the Debtors to transfer to the Bank of Oklahoma certain oil and gas properties secured by the Bank of Oklahoma's debt, but thereafter continue to act as the operator on those properties. After Debtors fully satisfy their obligations owed to Bank of Oklahoma, Debtors will act as an operator on an expense-only basis and net revenue will be transferred to the Bank of Oklahoma.  Regarding unencumbered oil and gas properties, Debtors will maintain ownership and continue their operations after the Confirmation Date. The Plan will allow the Debtors to fully satisfy their obligations and significantly enhance distributions to creditors. In short, the Plan will allow the Debtors to reorganize and full satisfy their secured debts with through specific payment requirements and transfers of real property, and provide payments to unsecured creditors over time. Unsecured creditors will be satisfied in full by receiving 60% of any allowed claim. The Plan allows secured and unsecured creditors to benefit from any potential upside in connection with the restructuring as opposed to a liquidation. The Plan also provides for the assumption of certain contracts that may otherwise be terminated in a liquidation. The Plan shall also be deemed to be a motion by each Debtor, if applicable, to assume Joint Operating Agreements (JOAs) and other executory contracts as discussed in greater detail herein.

The Debtors will seek to have Creditors cast a ballot in favor of the plan for all three Debtors. If the Debtors obtain the votes needed to confirm all portions of the Plan and do not otherwise sever any Debtor from the Plan, the Debtors will proceed with the joint plan unless the Court rules that the Plan cannot be confirmed at the confirmation hearing. In that case, one or more Debtors may seek confirmation of the Plan as its Plan, consistent with the Court's order. In that event, it is likely the Debtor that cannot confirm the Plan cannot restructure and will have no choice but to liquidate.

This Disclosure Statement will discuss each class and its treatment in detail so creditors may cast an informed vote. The alternative to the Plan -- liquidation of the Debtors' assets in or outside of bankruptcy -- would likely generate substantially less value for all creditors. The Debtors believe that the Plan is far superior to the alternative, chapter 7, which would irreparably harm the value of the Debtors' operating assets, and undoubtedly, would leave little, if any, recovery for unsecured creditors after payments to secured creditors and administrative claims.

The Plan is being funded from cash generated from the Debtors' cash on hand in their Estates, the transfer of certain collateral securing creditors' claims, revenue and other income from the Reorganized Debtors' operations or other assets, proceeds from the Avoidance Actions, and the cash proceeds generated from sales of Debtors' or the Reorganized Debtors' encumbered or unencumbered assets, which will be conducted in their discretion and as necessary. Proceeds from any sale of encumbered assets will be paid to the secured creditor absent its express written consent for the applicable Debtor to otherwise use the proceeds.

This Disclosure Statement provides the Holders of Claims against, and equity interests in, the Debtors adequate information about the bankruptcy estates and the Plan in order for them to make an informed judgment about the merits of the Plan before voting on the Plan. The Plan is the definitive, legally-binding document. <u>YOU ARE ENCOURAGED TO READ THE PLAN AND TO CONSULT WITH YOUR COUNSEL ABOUT IT</u>. **Each Holder of a Claim or Interest is urged to carefully consider the Plan and this Disclosure Statement in their entirety and consult with legal or other available counsel or professionals to understand the Plan and its effects, including possible tax consequences.**

This Disclosure Statement is meant to be helpful, but you should not rely on it alone because the terms of the Plan control over any statement in this Disclosure Statement. [3] Capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan. Section V of the Plan contains most of the defined terms used in the Plan and the Disclosure Statement. Other capitalized terms may be defined in the Bankruptcy Code.

This Disclosure Statement has not been approved or disapproved by the United States Trustee ("U.S. Trustee"), and the U.S. Trustee has not confirmed the accuracy or adequacy of any statements contained in this document. In addition, approval of this Disclosure Statement by the Bankruptcy Court does not constitute or imply approval by the Court of the Plan.

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THESE DOCUMENTS IN THEIR ENTIRETY.**

This Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Court will follow when determining whether to confirm the Plan, and describes how the Plan will be implemented if it is confirmed by the Bankruptcy Court. Bankruptcy Code section 1125 requires that a disclosure statement contain "adequate information" concerning a plan of reorganization. 11 U.S.C. § 1125(a). On _____, 2016, the Court approved the form of this document as an adequate disclosure statement that contains enough information to

---

[3] The Plan is the legally operative document regarding the treatment of Claims and Interests and the terms and conditions of the Debtors' reorganization. Accordingly, to the extent that there is any inconsistency between the terms contained herein and those contained in the Plan, the terms of the Plan govern.

3

enable entities affected by the Plan to make an informed judgment when deciding whether to vote to accept or reject the Plan.

Court approval regarding the adequacy of this Disclosure Statement, however, constitutes no determination by the Court regarding the fairness or the merits of the Plan or the accuracy or completeness of the information in the Plan or Disclosure Statement. **THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THEREFORE, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF THE COURT LATER CONFIRMS THE PLAN, AND THE EFFECTIVE DATE OCCURS, THE PLAN WILL THEN BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES**.

The chapter 11 process affords a debtor the opportunity to resolve disputes globally and in a manner that is fair to all constituents. Such a global resolution is important in these chapter 11 cases if the Debtors are to successfully reorganize. The Debtors believe that the Plan provides the greatest possible recoveries to creditors, acceptance of the Plan is in the best interests of all parties in interest, and any alternative would cause unnecessary delay, uncertainty, and expense to the Estates. The Debtors therefore strongly recommend that all eligible creditors entitled to vote on the Plan cast their ballots to accept the Plan.

4



**Notes:**

Dotted line used for visual distinction only.

Ownership percentages are displayed rounded for simplicity

Various Family Owners, Outside Owners, and Roger Armstrong are individual owners
DJ Simmons Inc., DJ Simmons Company Ltd., and Kimbeto Resources, LLC are Oil and Gas E & P entities
Twin Stars Ltd. and Twin Stars Compression, LLC are service companies

## II.
## OVERVIEW OF THE PLAN AND ITS STRUCTURE

The Plan provides for the Debtors to continue operations as going concerns, although on a more minimal basis due to transferring certain properties to the Bank of Oklahoma, and proposes to satisfy all creditors in full. If all creditors are not satisfied in full by January 31, 2022, equity interest holders will not retain their interests in any Debtor.

The Debtors have over $9 million in obligations owing to their prepetition lender, Bank of Oklahoma. The debt is secured by liens against some of the Debtors' assets and property. Two other secured creditors exist: (1) Four Corners Community Bank, which has a secured interest in the real property that includes a parking lot and an office building owned by DJS Co. LP, and (2) Gordon Neal Crane and Dorcan Ann Crane Living Trust and Donald C. Adams Revocable Trust, which has a secured interest in a vacant lot of real property.

Priority tax claims were also filed, but the Debtors believe these are overstated or do not account for all payments received by such creditors. Allowed priority tax claims will be paid as required by the Bankruptcy Code. There are no priority wage claims filed by employees. Other

Claims concern unsecured debts such as trade vendors, employees, general debts, and governmental obligations that Debtors believe are not yet owed or will be fully satisfied when owed. Finally, certain creditors assert Claims regarding royalty or working interests in oil or gas wells and/or oil or gas leases.

To address these claims comprehensively, the Plan sets forth a mechanism to compromise all of them. The Debtors believe that the proposed compromises are appropriate in light of the circumstances in these Cases and applicable law.

Unclassified claims, such as U.S. Trustee Fees, Professional Fee Claims, Administrative Claims, and Priority Tax Claims, will be paid in full on the Distribution Date or otherwise be fully satisfied through a payment plan or alternative agreement between the applicable Debtor and the holder of the claim. Debtors do not believe there are allowed priority claims other than Priority Tax Claims, which may be paid over time under applicable law.

Regarding Secured Claims, undersecured creditor Bank of Oklahoma's Allowed Secured Claim, as reflected in Class 1.A, will be paid or otherwise satisfied in full through a $250,000 payment and transfer of collateral from Debtors to the Bank of Oklahoma as set forth in Section I(A)(2)(a) of the Plan. Regarding oversecured claims, the Four Corners Community Bank's Allowed Secured Claim, as reflected in Class 1.B, will be satisfied either by payment in full or transferring the collateral from DJS Co. LP to Four Corners as set forth in Section I(A)(2)(b) of the Plan. Finally, the Adams and Crane Trusts Secured Claim, as reflected in Class 1.C, will be paid in full over time.

Class 2 consists of creditors that are parties to joint operating agreements ("JOA") and conduct joint interest billings with one or more Debtors. Some of these agreements provide for security to Class 2 claimants. Class 2 claimants may therefore be secured for the full amount or a certain portion of their claim. Class 2 will be paid in full over time by recouping or offsetting revenue otherwise owed to the applicable Reorganized Debtor to pay Class 2 claims. Once paid in full, Class 2 creditors must provide all future revenue to the applicable Reorganized Debtor under each respective JOA.

Holders of Allowed Oil and Gas Royalty and Lease Payment Claims in Class 3 will be paid in full over the course of three months. General Unsecured Claims of each Debtor are in Class 4.A, 4.B, and 4.C of the Plan, and will share in the proceeds of the Avoidance Actions in addition to payment of 60% of their respective Claim no later than January 31, 2022. The Debtors' right to object to any claim on any ground shall be reserved.

Equity holders of Interests will retain their interests if all Allowed Claims are satisfied in full or the Claimant otherwise agrees that it has been satisfied in full. If all Allowed Claims are not paid or otherwise fully satisfied in full by January 31, 2022, the holders of Interests will retain nothing and their ownership Interests will be extinguished.

The balance of this Disclosure Statement contains detailed descriptions of the Plan, including the proposed compromises and pertinent information regarding the Debtors' assets, liabilities, and operations.

### III.
### GENERAL DISCLAIMERS AND INFORMATION

Please carefully read this document and the Exhibits to this document. These documents explain who may object to confirmation of the Plan, who may vote to accept or reject the Plan, and the treatment that Holders of Allowed Claims against the Debtors and Holders of Interests in the Debtors may expect to receive if the Court confirms the Plan. The Disclosure Statement also describes the Debtors' history, the events precipitating the Cases, other events in the Cases, the effect of Plan confirmation, and other information the Court may consider in deciding whether to confirm the Plan.

The statements and information in the Plan and Disclosure Statement do not constitute financial, legal, or tax advice. You should consult your own advisors if you have questions about the impact of the Plan on your Claims or Interests. The summary information and all other statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the Exhibits annexed to the Plan, and the Exhibits to the Disclosure Statement.

The financial information used to prepare the Plan and Disclosure Statement was prepared by the Debtors from information in the Debtors' books and records and is the sole responsibility of the Debtors. The Plan was prepared with the review, input, and assistance of the Debtors' management. The Debtors' professionals have not independently verified this information.

The statements and information in this document constitute the only statements and information that the Bankruptcy Court has approved to solicit votes to accept or reject the Debtors' Plan, and such statements and information may not be relied upon for any other purpose. Statements or information inconsistent with anything contained in this Disclosure Statement are not authorized unless otherwise ordered by the Bankruptcy Court.

Nothing in the Plan or Disclosure Statement constitutes an admission of any fact or liability by any party or may be deemed to constitute evidence of the tax or other legal effects that any Debtor's reorganization may have on entities holding Claims or Interests. This Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but as a statement made in settlement negotiations, regarding contested matters, future adversary proceeding, or any other dispute.

Unless another time is expressly specified in this Disclosure Statement, all statements are made as of the date of this Disclosure Statement, October 24, 2016. Under no circumstances will the delivery of this Disclosure Statement or the exchange of any rights made under the Plan create an implication or representation that there has been no subsequent change in the information in this document. Neither the Debtors nor any other party assumes any duty to update or supplement any of the information in this document, nor do they intend to undertake any such updates or supplements.

This Disclosure Statement has been prepared under section 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with federal or state securities laws or other applicable law.

## IV.
## THE PLAN CONFIRMATION PROCESS

What follows in this Section IV is a general discussion of the rules governing who may vote to accept or reject a chapter 11 plan of reorganization, the votes necessary to confirm a chapter 11 plan, and the circumstances under which a plan may be confirmed even if a particular class of creditors or interest holders does not accept the plan.

**A.      Who May Vote to Accept Or Reject the Plan.**

To vote to accept or reject the Plan, your claim or interest must be "allowed" and "impaired," and the Plan must provide that you will receive or retain some value. Holders of unimpaired claims are deemed to have accepted the Plan and do not vote, though they may object to confirmation of the Plan to the extent they otherwise have standing to do so. Holders of claims or interests that do not receive or retain any value under the Plan are deemed to reject the Plan. As defined by the Bankruptcy Code, a claim generally includes all rights to payment from a debtor, while an interest generally represents an ownership stake in a debtor.

**1.      Allowed Claims and Interests.**

With the exceptions explained below, under the Bankruptcy Code, a claim or interest is generally allowed only if a proof of the claim or interest is properly filed before the bar date and either no party in interest has objected or the Court has entered an order allowing the claim or interest. The general bar date in this case was May 27, 2016. The governmental claims bar date was August 29, 2016. Under certain circumstances as provided in the Bankruptcy Code, a creditor may have an allowed claim even if a proof of claim was not filed and the bar date for filing a proof of claim has passed. For example, a claim may be deemed allowed if the claim is listed on the debtor's schedules of liabilities filed with the court and is not scheduled as disputed, contingent, or unliquidated.

A Holder's Claim must be an Allowed Claim, or must be allowed for purposes of voting, for the holder of such Claim to have the right to vote on the Plan. Generally, for voting purposes only, a Claim is deemed Allowed if: (1) either (a) a proof of claim was timely filed or (b) a proof of claim was deemed timely filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a final order; <u>and</u> (2) (a) the Claim is not subject to an objection or (b) the Claim is allowed either by a final order or under the Plan.

An entity whose Claim is subject to an objection is not eligible to vote on the Plan unless (1) that objection is resolved in such entity's favor or (2) after notice and a hearing under Bankruptcy Rule 3018(a), the Bankruptcy Court temporarily allows the entity's Claim for the purpose of voting to accept or reject the Plan. Any entity that seeks temporary allowance of its Claim for voting purposes must promptly take steps to arrange for an appropriate and timely

8

hearing with the Court. The procedures for Claim Objections and resolving disputed Claims are set forth in Article III of the Plan.

**2.      Impaired Claims and Interests.**

Section I of the Plan and Section VIII of this Disclosure Statement describe the Classes of Claims and Interests that the Debtors believe to be impaired or unimpaired under the Plan.

Generally speaking, under the Bankruptcy Code, a class of claims or interests is "impaired" if the plan alters the legal, equitable, or contractual rights of the members of the class in any way, even if the alteration is beneficial to the creditors or interest holders. Bankruptcy Code section 1124 provides that a claim or interest is impaired for purposes of chapter 11 <u>unless</u> the plan:

(i)      leaves unaltered the legal, equitable and contractual rights of the holder of such claim or interest; or

(ii)      notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default -

(a)      cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(b)      reinstates the maturity of such claim or interest as it existed prior to the default;

(c)      compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law;

(d)      if such claim or interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(i)(A) of the Bankruptcy Code, compensates the holder of such claim or interest (other than the debtor or an insider of the debtor) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(e)      does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitled the holder of such claim or interest.

**B.      Votes Necessary to Confirm the Plan.**

Under the Bankruptcy Code, impaired claims or interests are placed in classes under a plan, and it is the class that must accept that plan. Section I(A) of the Plan and Section VIII(C) of

9

this Disclosure Statement summarize the classification of all Claims and Interests under the Plan. There are also unclassified claims because the Bankruptcy Code requires that they be treated a certain way. These claims are considered unimpaired, and their holders cannot vote.

The Bankruptcy Code does not require that each claimant or shareholder vote in favor of a plan for the court to confirm a plan. Rather, a plan must be accepted by each class of claims and interests (subject to the "cramdown" exception discussed below). A class of claims accepts the plan if, of the claimants in the class who actually vote on the plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. If a hypothetical class has twenty-five creditors that vote and the total dollar amount of those creditors' claims is $1,000,000, then for that class to have accepted a plan, thirteen or more creditors must have voted to accept the plan (a simple majority) *and* the claims of the creditors voting to accept the plan must total at least $666,667 (a two-thirds majority). A class of interest holders accepts a plan if, of the holders in such class who vote on such plan, at least two-thirds in amount vote to accept the plan.

Under the Bankruptcy Code, a bankruptcy court may confirm a plan if at least one class of impaired claims has voted to accept that plan (without counting the votes of any insiders whose claims are classified within that class) and if certain statutory requirements regarding treatment of objectors within a consenting class and rejecting classes are met.

**C.      Confirmation Hearing.**

Following the voting on a plan, the Bankruptcy Court will hold a hearing on confirmation of the plan. Even if a plan receives the requisite votes, a plan will not become binding unless the Bankruptcy Court makes an independent determination that the plan satisfies the confirmation requirements set forth in Bankruptcy Code section 1129. This determination will be made at the Confirmation Hearing. As discussed in Section VI of this Disclosure Statement, any Holder of an Allowed Claim or Interest may appear and object to confirmation of the Plan.

**D.      Cramdown: Treatment of Non-Consenting Classes.**

Even if all classes do not consent to the proposed treatment of their claims under a plan, a plan may be confirmed if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code. This process is commonly referred to as "cramdown." The Bankruptcy Code allows dissenting classes to be crammed down if the plan does not "discriminate unfairly" and is "fair and equitable." The Bankruptcy Code does not define unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment.

For a class of secured claims, "fair and equitable" can mean that the secured claimants retain their liens and receive deferred cash payments for which the present value equals the value of the secured claimant's interest in collateral. For a class of unsecured claims, a plan is fair and equitable if the claims in that class receive value equal to the allowed amount of the claims, or, if the unsecured claims are not fully satisfied, no claim or interest that is junior to such claims receives or retains anything under the plan.

10

If a class of unsecured claims rejects a plan under which a junior class (e.g., a class of interest holders) will receive or retain any property under the plan, the plan cannot be confirmed (with certain possible exceptions) unless the plan provides that the class of unsecured creditors receives value equal to the allowed amount of the claims in that class.

## V.
## INFORMATION REGARDING VOTING IN THIS CASE

**A.     Voting Instructions.**

The Debtors believe that Classes 1.A, 1.B, 1.C, 2, 3, 4.A, 4.B, and 4.C are Impaired and the Holders of Claims in those Classes may vote on the Plan. The Holders of the Claims and Interests in Class 5 will either retain their Interests or the Interests will be cancelled, so Class 5 is not entitled to vote or is deemed to reject the Plan. Administrative Claims and Priority Tax Claims are not classified under the Plan and the Holders thereof are not entitled to vote.

In voting to accept or reject the Plan, please use only the ballot sent to you with this Disclosure Statement, and carefully read the voting instructions on the ballot for an explanation of the voting procedures and deadlines. If you have received this Disclosure Statement without a ballot, the appropriate Debtor believes that you are: (i) a Holder of a Claim that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan; (ii) a Holder of an Interest that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan, or (iii) otherwise not the Holder of a Claim entitled to vote to accept or reject the Plan.

If you nevertheless believe that you may vote on the Plan, you must file and serve a motion requesting a determination that you may vote on the Plan and arrange for such motion to be heard by the Court prior to the hearing on confirmation of the Plan. Before doing so, first confirm that the absence of a ballot was not inadvertent by contacting Lindquist & Vennum LLP, Attn: D.J. Simmons Ballot Tabulator / Ethan J. Birnberg, 600 17th Street, Suite 1800 South, Denver, Colorado 80202, ebirnberg@lindquist.com, Facsimile: 303-573-1956.

If you wish to vote to accept or reject the Plan, your ballot must be received by the D.J. Simmons Ballot Tabulator, at the mailing address, e-mail, or facsimile number listed above, no later than 5:00 p.m. prevailing Mountain Time, on **December 16, 2016**. If your ballot is not timely received by the D.J. Simmons Ballot Tabulator, it will not be counted. Ballots may be provided to the D.J. Simmons Ballot Tabulator by e-mail, mail, overnight delivery, messenger, or facsimile. You are encouraged to mail a hard copy of your ballot, whether or not you e-mail it.

Any interested party desiring further information regarding the Plan, or seeking additional copies of this document, should contact Debtors' Counsel at the contact information stated above. All pleadings and other papers filed in these Cases may also be inspected by interested parties at the office of the Clerk of the Court, 721 19th Street, Denver, CO 80202-2508, and are available online through the Court's PACER service (see www.cob.uscourts.gov for more information).

# VI.
## WHO MAY OBJECT TO PLAN CONFIRMATION

A hearing has been scheduled for _____ **2016, at __:__ a.m./p.m.** prevailing Mountain Time before the Honorable Joseph G. Rosania, United States Bankruptcy Judge at the United States Bankruptcy Court, 721 19th Street, Denver, Colorado 80202-2508, to determine whether the Bankruptcy Court will confirm the Plan.

Any party that objects to confirmation of the Plan must file and serve its objection and evidence in support thereof by **December 16, 2016** ("Confirmation Objection Deadline"). Any objection to confirmation of the Plan must be in writing, specify the name and address of the party objecting, the claims and any other grounds giving the objector standing to object, and specific grounds for the objection. Any objection must be served on the U.S. Trustee, DJS Co. LP, DJS, Inc., and Kimbeto.

Failure to properly and timely file an opposition to Plan confirmation and appear at the Confirmation Hearing will be deemed to be consent to the Plan's confirmation. If you wish to obtain more information, contact: Ethan J. Birnberg, Debtors' Counsel, at the contact information stated above.

Any party seeking to assert any Administrative Claim (as defined in the Plan) must file such claim by **November 28, 2016**, setting forth the amount, basis, and specific grounds for the Administrative Claim. Failure to properly and timely file such claim will bar such claim from future allowance.

# VII.
## DESCRIPTION OF THE DEBTORS' BUSINESS, EVENTS LEADING TO THE CHAPTER 11 FILINGS, AND SIGNIFICANT EVENTS IN THESE CHAPTER 11 CASES

**A.      Description of the Debtors' Businesses and Assets.**

DJS Co. LP is a limited partnership and DJS, Inc., is a corporation. Both were formed in the early to mid-1990s. DJS Co. LP was formed to hold oil and gas properties previously owned by Jack Simmons and his family. Several trusts inherited ownership of these properties, and formed the Debtors to manage and operate their businesses. In 2000, Kimbeto, a limited liability company, was formed for the same purpose as DJS Co. LP, but for operations on Native American land owned by the Jicarilla Apache Tribe. DJS, Inc., is the operating arm for the exploration and production of properties owned by the other Debtors. Each Debtor is owned by Interest holders, who also serve as limited partners of DJS Co. LP and shareholders of DJS, Inc.

Including operations by Jack Simmons and his family prior to the early 1990s, D.J. Simmons has been producing and exploring for oil and gas in the Rocky Mountain region for 60 years and operates over 100 wells in the Four Corners area. It has amassed several producing properties throughout the San Juan Basin of northwest New Mexico and the Paradox Basin of southeastern Utah and southwestern Colorado.

12

The properties consist primarily of conventional tight sand natural gas and oil production in the San Juan Basin and conventional carbonate reservoir oil and natural gas production in the Paradox Basin. This production is long-lived and stable from known reservoirs with excellent infrastructure. Debtors' upside includes development potential on about 3,000 acres in the San Juan Basin and approximately 20,000 acres in the Gothic and Hovenweep shales in the Paradox Basin.

Debtors have several projects operated by DJS, Inc., and own interests in properties operated by other entities, such as ConocoPhillips and Coleman Oil and Gas. Under the Plan, Debtors intend to keep operating, minimize costs, promote efficiency by plugging uneconomic wells (while fully complying with state and federal regulatory standards), and assume certain contracts that are executory under the Bankruptcy Code, if assumption has not already occurred. Debtors, however, will transfer ownership of certain oil and gas properties to the Bank of Oklahoma, and will remain the operator of these properties. Debtors will continue to operate the properties on an expense basis with all net revenue transferred to the Bank of Oklahoma. Debtors will fully satisfy their debt owed to the Bank of Oklahoma through the Plan, and their agreement to operate these properties once transferred to the Bank of Oklahoma need not be part of the Plan.

DJS, Inc., will operate the same properties for DJS Co. LP and Kimbeto after confirmation (and for the benefit of the Bank of Oklahoma regarding the properties transferred from Debtors to it under the Plan), and will continue to seek new operating and management opportunities within and outside the San Juan Basin and Paradox Basin. If Debtors believe that they should liquidate their remaining property for efficient operations, to pay debts, or for any other reason, Debtors will market, negotiate, and sell these assets at their discretion and without the need for Court approval.

## B.     Description of the Debtors' Major Liabilities.

### 1.     Prepetition Credit Agreement.

The Debtors are parties to an Original Credit Agreement, as borrowers, with the Bank of Oklahoma, as lender. The Credit Agreement provided a revolving line of credit and was originally dated September 20, 2002. As of the Petition Date, the Debtors believed they were indebted to the Bank of Oklahoma for $9,156,050. To secure the debt, the Debtors granted liens on and security interests in some of the Debtors' assets and property and the proceeds thereof. On May 15, 2015, the parties executed a First Amendment to a Second Amended and Restated Loan Agreement. At that time, the Bank of Oklahoma amended its commitment under the line of credit from $11,000,000 to $10,250,000, and Debtors provided a $200,000 payment towards the principal debt under the revolving line of credit. The maturity date was September 20, 2015. Debtors did not provide payment in full when the credit line matured. The Bank of Oklahoma has filed proofs of claim in each of the Debtors' cases for $9,269,863.04 related to the Credit Agreement and other claims related to letters of credit.

To the best of Debtors' knowledge, except for any liens filed by the Bank of Oklahoma, there are no mechanic's liens or materialmen's liens or lien notices recorded against any of

Debtors' oil and gas properties. In December 2015, the Bank of Oklahoma declared a default under a certain Hedge Agreement (defined below) and collected $103,950 from terminating the hedge. Starting in January 2016, the Bank of Oklahoma contacted Debtors' purchasers, transporters, gatherers, receivers, or other trade vendors and demanded that all payments produced from oil, gas, or other hydrocarbons be sent to the Bank of Oklahoma instead of the Debtors.

### 2.      Purchase of Real Property and Remodel of Office Building.

In 2005, DJS Co. LP received a $423,408.24 loan from Four Corners Community Bank for the purchase of real property. In 2012, Four Corners Community Bank provided an additional loan to fund a remodel and construction project for the same property at 1009 Ridgeway Place, Suite 200, Farmington, NM 87401. On or about February 24, 2012, the amount of the loan was $1,000,000 (the "FCCB Loan"). DJS, Inc., executed a guaranty related to the loan. Four Corners Community Bank has filed duplicate proofs of claim for $892,156.46 as a secured claim against DJS Co. LP and for the guaranty obligations against DJS, Inc.

The FCCB Loan is secured by the real property and office building located thereon. In May 2015, the office building was appraised at $1.18 million. Debtors understand that an additional appraisal may have been conducted since that time and have not evaluated the accuracy of any appraisals after May 2015. The FCCB Loan is also secured by a vacant lot next to the office building owned by DJS Co. LP. On December 18, 2012, the parties executed a Debt Modification Agreement. As of the Petition Date, the maturity date for the loan was December 7, 2022.

DJS, Inc., leases the office building from DJS Co. LP. Debtors have assumed this executory contract and continue their efforts to sell the property. DJS Co. LP intends to transfer the vacant lot to FCCB to lower DJS Co. LP's debt by $225,000. Dimmick Realty has been employed by DJS Co. LP to market and sell the property. The property has been for sale since before the Petition Date.

### 3.      Crane Living Trust and Adams Revocable Trust Secured Claim.

On January 31, 2006, Gordon Neal Crane and Dorcan Ann Crane Living Trust & Donald C. Adams Revocable Trust (the "Crane/Adams Trusts") granted real property at 550 N 1st St. Lot, Bloomfield, NM 87413 (the "Lot") to DJS Co. LP. This was a seller-backed real estate sale for $300,000. The parties entered into a real estate contract, wherein DJS Co. LP would pay monthly installments until paid in full. The debt is secured by the Lot. The Crane/Adams Trusts filed proofs of claim alleging that that they are owed $136,166.82 as of the Petition Date. The Debtors and Crane/Adams Trusts have review the proof of claim and agree that the allowed amount is $142,974.82. The Debtors and the Crane/Adams Trusts have valued the Lot at $350,000.

14

4.      **Oil and Gas Royalty and Lease Payments.**

In the ordinary course of business, the Debtors distribute the proceeds derived from the production of gas wells that they operate to those parties entitled to royalties or overriding royalties, or payments as working interest holders. Some payments were held up shortly before and after the Petition Date, but since the Court has authorized DJS, Inc., to make these payments, the Debtors are current in satisfying these obligations.

5.      **Other Unsecured Liabilities.**

The unsecured claims, which were either filed against Debtors or listed as not contingent, unliquidated, and not disputed, and not counting identical claims filed against multiple Debtors, are: $772,062.54 owed by DJS Co. LP; $4,198,031.55 owed by DJS, Inc.; and $37.55 owed by Kimbeto. These amounts do not include intercompany claims described below, nor certain claims that have been resolved or withdrawn prior to this amended Disclosure Statement. Debtors believe that, through the Plan, they are satisfying all secured creditors in full and no deficiency claims exist. The Debtors dispute several unsecured claims filed in these Cases, specifically those that are speculative, not owed, relate to future obligations such as plugging and abandoning wells that are currently capable of producing hydrocarbons in commercial quantities, or otherwise will not be Allowed Claims. As of this Disclosure Statement, Debtors have fully complied with all environmental and plugging requirements promulgated by responsible agencies.

6.      **Intercompany Claims.**

As of the Petition Date, the Debtors' books and records reflect that DJS Co. LP owes approximately $2,662,704.37 to DJS, Inc., for intercompany obligations. DJS, Inc., is the management company for DJS Co. LP and Kimbeto, and operates many of the wells in which they hold interests. DJS, Inc., collects revenues from oil and gas purchasers, pays almost all the production and administrative expenses, and carefully and appropriately allocates these expenses to the proper Debtor. If the revenues exceed expenses, it is credited (or conversely, when expenses exceed revenues, debited) through each company's intercompany due-to or due-from account. Because cash management is centralized at DJS, Inc., the intercompany due-to/from accounts can build up over time. To provide the maximum distribution on Allowed Claims, the intercompany debts will be subordinated to all other claims in the unsecured class.

7.      **Hedge Agreements.**

Under an ISDA Master Agreement, dated as of September 1, 2009 (including a subsequent amendment or modification), and various confirmations and addenda executed in connection therewith, DJS, Inc., was party to certain commodity swap transactions regarding the natural gas market (collectively, "Hedge Agreements") with Bank of Oklahoma. Under the Hedge Agreements, DJS, Inc., hedged the price it would realize from the sale of natural gas through various dates in 2009 through 2014.

15

The Hedge Agreements were terminated by the Bank of Oklahoma on December 14, 2015. Bank of Oklahoma received $103,950 from this termination, and these funds were applied prepetition to lessen the amount owed under the Original Credit Agreement.

DJS, Inc., and BP Energy Company also executed an ISDA Master Agreement dated March 1, 2011, which has been amended or supplemented and is still operative. As of this Amended Disclosure Statement, the option to execute a hedge agreement is still available to DJS, Inc.

### 8.      Joint Operating Agreements.

Debtors are a party to approximately 32 JOA's governing the relationship of working and royalty interest owners in and the management and operation of wells in the San Juan Basin and Paradox Basin. DJS, Inc., serves as operator under approximately 21 of the JOAs. Third parties serve as operator under the remaining JOAs.

### a.      Disposition of the JOAs.

To continue operations and consummate its proposed plan, the Debtors intend to assume, or already have assumed, all JOAs in existence as of the Petition Date. On August 8, 2016, the Court approved a settlement agreement and sale of assets with WPX, which included a JOA, as discussed in Section VII(E)(7). On September 12, 2016, the Court granted Debtors' motion for authority to assume all executory contracts other than the federal leases. (Docket Nos. 198, 199, 200).

Most if not all JOAs were already assumed through the Court's Order providing the applicable Debtor authority to assume the JOAs under 11 U.S.C § 365. (Docket Nos. 198, 199, 200). Readers and parties to all other JOAs should review the Schedule of Assumed Contracts and Leases attached as Exhibit 5. Debtors or the applicable Debtor will assume any JOAs considered executory contracts, and believe no defaults exist or have not been satisfied under 11 U.S.C. § 365. If Cure Payments are owed, parties subject to JOAs must notify the Debtor or file an objection pursuant to Section II of the Plan.

### C.      Debtors' Board and Management.

DJS Co. LP is managed by DJS, Inc., its General Partner. The same eight persons or trusts are limited partners of DJS Co. LP, shareholders and members of DJS, Inc.'s Board of Directors, and equity holders of the Debtors. A list of these individuals or entities is on **Exhibit 6**. On the Petition Date, John Byrom served as President of DJS, Inc., and Jeff Parkes served as Vice President, Secretary and Treasurer. As provided in Section I(A)(2)(h) of the Plan and Section VII(C)(2)(h) of this Amended Disclosure Statement, no equity holders will receive any distribution or payment of any kind on account of their equity interests until all creditors are satisfied in full. Further, if all creditors are not fully satisfied by January 31, 2022, the equity ownership interests will be cancelled.

16

Regarding Kimbeto, DJS, Inc., holds a 1% ownership interest and serves as it Managing Member. DJS Co. LP holds a 98% ownership interest, and Duane Aspaas holds a 1% ownership interest.

On July 8, 2016, Mr. Byrom resigned as President. On that same day, Rodney L. Seale was appointed President of DJS, Inc. On September 19, 2016, Jeff Parkes resigned and Nancy Walden succeeded Mr. Parkes. Mr. Seale and Ms. Walden are the only two employees. After the Confirmation Date, DJS, Inc., will continue to serve as DJS Co. LP's General Partner and Kimbeto's Managing Member.

## D.      Events Leading to the Chapter 11 Filing.

The Debtors, either by themselves or through their predecessors in interest, have been exploring, developing, and producing oil and gas for over sixty years. The primary debt owed to the Bank of Oklahoma relates to a credit agreement executed in 2002. Debtors operated their businesses, paying employees, fully complying with state and federal requirements and making payments on account of their obligations owed to all creditors. Debt was paid down and additional funds were loaned to fund investment opportunities on several occasions. Several additional draws that were made on the line of credit held with the primary lender through 2013 and 2014 to invest in new well drilling failed to produce sufficient returns on the investment. Debtors' credit line was fully extended and natural gas commodity prices dropped dramatically, resulting in insufficient cash flow to service the incurred debt. The continued and rapid deterioration of natural gas commodity and oil prices caused lenders to severely limit, and at times terminate, credit for oil and gas producers. This was an industry-wide problem, and it precluded Debtors from meeting their financial obligations.

Debtors' credit agreement with the Bank of Oklahoma matured on or around October 1, 2015. Debtors could not pay their debt in full. As discussion in Section VII(B)(1) and (7), the Bank of Oklahoma enforced its rights under the loan documents, collected under a hedge agreement, and sought to suspend Debtors' revenue from their purchasers and vendors. After losing the hedge agreement, the Debtors became fully exposed to the impact of natural gas and oil price fluctuations in the commodity markets, which caused additional negative impact on their business affairs.

Prior to the Petition Date, Debtors continued their efforts to either sell assets or obtain additional capital. Debtors negotiated with Bank of Oklahoma regarding restructuring or other alternatives, but the parties could not reach an agreement.

Faced with the defaults under the Original Credit Agreement and loss of their hedge agreement, the inability to reasonably sell any assets given plummeting commodity prices, the inability to raise new capital to maintain or grow the business under the economic circumstances, and certain purchasers and vendors suspending Debtors' revenue due to Bank of Oklahoma's enforcement of its contractual rights, on March 1, 2016, the Debtors commenced bankruptcy cases under chapter 11 to provide the best alternative for restructuring their financial obligations and maximizing the value of their respective assets for the benefit of creditors and stakeholders.

### E.     Significant Events During the Chapter 11 Cases.

#### 1.     Continuation of Business.

Each of the Debtors filed a voluntary petition for relief on March 1, 2016. Subsequent to the Petition Date, the Debtors have continued to operate as a debtors-in-possession subject to the supervision of the Bankruptcy Court.

#### 2.     Joint Administration of All Three Cases.

On March 9, 2016, the Court granted Debtors' motion to jointly administer the three cases subject to this Disclosure Statement. The Court ordered that a comprehensive and limited service list be created and updated, as needed, on a weekly basis. *See* Dkt. #20. The Debtors have timely complied and the operative lists as of this Disclosure Statement are Comprehensive Service List No. 2 (Dkt. # 99) and Limited Service List No. 5 (Dkt # 114).

#### 3.     Postpetition Developments.

Since filing their bankruptcy cases, the Debtors have taken significant measures to cut costs and create stability within their operations. They have protected their assets and their lenders' collateral by minimizing costs and shutting in wells that may cause negative cash flow due to the decrease in commodity prices. Debtors have benefitted from the collection of revenue that was suspended as result of Bank of Oklahoma's pre-petition enforcement efforts, and negotiated price concessions from certain vendors. Debtors have also received or have discussed offers to sell certain real and personal property that will provide more revenue, limit expenses and potential liability, and provide a greater chance for a successful reorganization. If purchase and sale agreements are executed prior to the Confirmation Date, the Debtor will seek Court approval of any sale. In addition, Debtors significantly limited their overhead and expenses by replacing or reducing personnel. Debtors believe they are now in a better financial position, particularly with oil and gas prices increasing, to make the proposed payments to creditors and successfully reorganize.

#### 4.     Cash Collateral Motion.

On April 4, 2016, the Debtors filed their *Motion For Entry Of Interim And Final Orders (i) Authorizing The Debtors To Use Cash Collateral Of Existing Secured Lender, (ii) Granting Adequate Protection For Use Thereof, (iii) Modifying The Automatic Stay To Allow For The Relief Requested Herein And (iv) Scheduling Final Hearing* (Docket No. 54). The Debtors and Bank of Oklahoma thereafter reached an agreed interim order on use of cash collateral. On April 15, 2016, the Bankruptcy Court approved and entered an order on the parties' *Agreed Interim Order (I) Authorizing The Debtors To Use Cash Collateral Of Existing Secured Lender, (II) Granting Adequate Protection For Use Thereof, (III) Modifying The Automatic Stay To Allow For The Relief Requested Herein And (IV) Scheduling Final Hearing* (Docket No. 77) to extend the interim period to May 16, 2016. The agreement was extended two more times before a hearing on a final order was conducted. (Docket Nos. 88, 122).On August 12, 2016, after an evidentiary hearing, the Court entered its Final Cash Collateral Order. (Docket No. 150). That

18

order authorizes the use of cash collateral on a final basis through the earlier of (i) December 31, 2016, or (ii) the occurrence of an early termination event.

Through the Final Cash Collateral Order, the Bank of Oklahoma was granted an Adequate Protection Superpriority Claim (as defined in the Final Cash Collateral Order). As such, the Bank of Oklahoma holds a senior Administrative Claim arising from the imposition and enforcement of the automatic stay of section 362(a) of the Bankruptcy Code and the diminution in value of its collateral, if any. Debtors do not believe that any diminution in value of the Bank of Oklahoma's collateral has occurred. If the Bank of Oklahoma holds an Adequate Protection Superpriority Claim in an amount more than $0, the Debtors will provide payment in full of the Adequate Protection Superpriority Claim on or before 45 days of the Court's adjudication allowing the Adequate Protection Superpriority Claim or within time a period otherwise agreed to by the parties.

**5.      Retention of Professionals.**

The Debtors requested that the Bankruptcy Court enter orders authorizing the employment of (i) Lindquist & Vennum LLP, as attorneys for the Debtors (Docket No. 38); (ii) L.S. Jones, P.C., as accountants for Debtors (Docket No. 37); (iii) Gerding & O'Loughlin, P.C., as attorneys and consultants for Debtors (Docket No. 40); (iv) Dimmick Realty as real estate broker for DJS Co. LP (Docket No. 81); and Mercer Capital as consultants, experts, and financial advisors (Docket No. 166).

The Bankruptcy Court entered the following orders approving the retention of: (i) Lindquist & Vennum LLP on March 28, 2016 (Docket No. 38); (ii) L.S. Jones, P.C., as accountants for Debtors on March 30, 2016 (Docket No. 41); (iii) Gerding & O'Loughlin, P.C. as attorneys and consultants for Debtors on March 30, 2016 (Docket No. 43); (iv) Dimmick Realty as real estate broker for DJS Co. LP (Docket No. 82); and Mercer Capital as consultants, experts, and financial advisors for Debtors (Docket No. 168).

On July 5, 2016, Lindquist & Vennum filed their first interim application for compensation and expenses. The Bankruptcy Court entered an order and granted the application on August 5, 2016. On September 22, 2016, L.S. Jones, P.C. filed its first and final application for compensation and expenses, separated by fees and expenses incurred in each of the Debtors' bankruptcy cases. On that same date, Gerding & O'Loughlin, P.C. filed its first and final application for compensation and expenses in the DJS, Inc. bankruptcy case. The Bankruptcy Court has not entered an order on these applications as of the date of this Amended Disclosure Statement.

**6.      Extension of and Debtors' Right to, Assume or Reject Executory Contracts.**

Debtors have oil and natural gas reserves from approximately 100 wells operated by DJS, Inc., and 500 wells operated by third parties, in Colorado, New Mexico, Utah, and Texas.

The Debtors are parties to hundreds of oil and gas leases as reflected in their Schedules G and exhibits (filed March 1, 2016), their three omnibus motions to assume executory leases and

19

contracts (Docket No. 170, 172, 174), and the Schedule of Assumed Contracts and Leases. Most, if not all of the unexpired leases, are held by DJS Co. LP and DJS, Inc. The Debtors also maintain a lease of nonresidential office space; specifically, DJS, Inc., leases office space owned by DJS Co. LP. Debtors are also parties to certain Surface Use and Right of Way Agreements that govern access roads to wells and pipelines. Finally, Debtors are parties to several JOAs, as discussed in Section VII(B)(8).

Debtors believe that the Oil and Gas Leases and certain Surface Use and Right of Way Agreements are interests in real estate and not subject to Section 365 of the Bankruptcy Code. Under applicable state law in Colorado, New Mexico, Utah, or Texas, Debtors believe that their leases and agreements include dedications and covenants that run with the land and are real property interests that are not subject to assumption or rejection under 11 U.S.C. § 365. Without waiving their position on the applicability of Section 365 of the Bankruptcy Code and out of an abundance of caution, Debtors have assumed any contract determined to be, whether in these Cases or otherwise, executory contracts, except for any contract for which an extension for Debtors' assumption was granted. On September 12, 2016, the Court granted the Debtors' three omnibus motion assuming these executory contracts. (Docket Nos. 198, 199, 200). The only remaining leases not assumed are certain Federal Lease Interests, which Debtors propose to assume through the Plan. The Plan constitutes a motion to assume such agreements, if they are executory contracts.

Information regarding assumption of the Federal Lease Interests is below in Section 9 (Anticipated Future Events). Without waiving any argument that certain agreements or contracts are not executory under the Bankruptcy Code, assumption of these leases is necessary for DJS, Inc., to continue to operate certain oil and gas properties, transfer certain properties to the Bank of Oklahoma and remain the operator of those properties, and sell any property it deems necessary (whether real or personal property) after the Confirmation Date.

### 7.    Sale of Assets to Bakken Salvage and Coleman Oil and Gas

On September 12, 2016, the Court approved a proposed sale of pumpjacks and other equipment by DJS, Inc., and DJS Co. LP, to Bakken Salvage, Inc. for $41,000. (Docket No. 197). Debtors have closed this sale.

On October 21, 2016, the Court approved a purchase and sale agreement between D.J. Simmons Company Limited Partnership and D.J. Simmons, Inc. and Coleman Oil and Gas, Inc., related to a Participation Agreement covering the exploration and development of certain lands in Rio Arriba County, New Mexico. (Docket No. 222). Under the purchase and sale agreement, D.J. Simmons Company Limited Partnership and D.J. Simmons, Inc. will withdraw from the Participation Agreement and sell their interest to Coleman for $394,824.40. Coleman will withdraw its unsecured claim for $14,363.64. The parties have not closed this transaction as of the date of this Amended Disclosure Statement.

8.      **Settlement with WPX and Transfer of Lease and Ownership Interest.**

DJS, Inc., and DJS Co. LP resolved a dispute with WPX Energy Production, LLC, regarding a Purchase and Sale Agreement for certain oil and gas leases. On August 22, 2016, the Court approved and authorized the settlement agreement between DJS Co. LP and DJS, Inc. (Docket No. 177). Under the agreement DJS, Inc., and DJS Co. LP transferred ownership of one well and its 10% interest in an oil and gas lease to WPX. The Bank of Oklahoma had a secured interest in the property being transferred and has provided consent for DJS, Inc., and DJS Co. LP to transfer the property to WPX under 11 U.S.C. § 363(f). The Bank of Oklahoma received $90,115 for its secured interest in the proceeds of its collateral and, on September 6, 2016, WPX withdrew its proof of claim no. 12-1 filed in Debtors' jointly administered bankruptcy case.

9.      **Anticipated Future Events.**

As stated in Section III(H) of the Plan, Debtors will continue to operate their business and transfer certain oil and gas properties to the Bank of Oklahoma. Debtors also intended to sell encumbered (DJS Co. LP's office building) and unencumbered assets in their business judgment. These sales are expected to close after to the Confirmation Date, and will not be subject to Court approval under 11 U.S.C. § 363.

Debtors have historically provided severance packages to outgoing employees when approved by the applicable Board of Directors. As of the petition date, there have been no severance payments made to DJS, Inc.'s former President John Byrom, former Vice President, Secretary and Treasurer Jeff Parkes, or any other financial officer. There is no committed time period to provide a severance payment, if any, for any former employee. Although these payments, if ever made, are in the ordinary course of Debtors' business and do not require Bankruptcy Court authority, in an abundance of caution, Debtors will seek Bankruptcy Court authority for any severance payment approved by its management or applicable Board of Directors before the Confirmation Date. To the extent that these decisions are made after the Confirmation Date, Debtors will make these payments in their discretion and without additional notice or Bankruptcy Court approval, but will still comply with all other payment obligations under the Plan.

Debtors intend to assume all Federal Lease Interests to continue to operate certain oil and gas properties. Debtors have conferred with the Department of Interior ("DOI"), on behalf of the Office of the Natural Resources Revenue ("ONRR"), regarding assumption of federal leases. On September 12, 2016, the Court granted Debtors' motion to extend the time period for assumption of these leases, with DOI and ONRR's consent, to December 31, 2016. (Docket No. 201). ONRR has filed a proof of claim for $1,765,059.02, which relates to royalty payments that were not identified and could not have been paid during the prepetition period. Debtors disagree that this proof of claim is allowable in the amount stated by ONRR. Section II of the Plan discusses assumption of the Federal Lease Interests and Debtors believe that the DOI and ONRR will consent to the assumption of these Federal Lease Interests and continue to cooperatively work with the Debtors to identify the appropriate amount owed to ONRR and this debt will be satisfied in full.

21

Finally, DJS Co. LP owns an approximate 45% interest in Twin Stars Compression, LLC. DJS Co. LP has previously received a yearly distribution on account of this interest, and DJS Co. LP anticipates receiving distributions of $300,000 or more during each of the five years under the Plan. These distributions, as shown on Exhibit 2 to this Amended Disclosure Statement, will be used to pay creditor claims.

### 10. Claims.

#### a. Scheduled and Filed Claims.

The Court set May 27, 2016, as the last day ("Bar Date") for filing proofs of Claim in each Case. The governmental claims bar date was August 29, 2016. The Debtors have provided notice of the Bar Date to all parties that are creditors or potential creditors of the Debtors.

The Debtors have commenced an evaluation of the proofs of claim filed in each case and preliminarily concluded that some of the claims asserted are objectionable and ultimately should be allowed in a lesser amount or entirely disallowed. Because the Debtors' analysis of these Claims has not been completed, it is not clear the extent to which (i) proofs of claim filed by creditors exceed the amounts in the Schedules and (ii) there may be allowable claims not reflected in the Schedules. Thus, solely because a claim is listed in the Disclosure Statement, Exhibits, or Plan as receiving a potential distribution does not mean it will receive such distribution if the claim is ultimately disallowed by the Court.

#### b. Claim Objections.

Prior to the Effective Date of the Plan, the Debtors will retain the right to object to Claims unless the time to object to claims has expired under the Final Cash Collateral Order. Upon the Effective Date of the Plan, only the Reorganized Debtors may object to Claims against them. The deadline for filing objections to Claims under the Plan is, unless extended by the Court, the later of (a) 180 days after the Effective Date, and (b) 180 days after the date on which the subject proof of claim, motion, or application was filed.

**ALL RIGHTS ARE RESERVED ON BEHALF OF THE DEBTORS, THEIR ESTATES, REORGANIZED DEBTORS, OR ANY OTHER PARTY IN INTEREST (TO THE EXTENT SUCH PARTY HAS STANDING TO OBJECT TO CLAIMS) WITH RESPECT TO THE ALLOWANCE OR DISALLOWANCE OF ANY AND ALL CLAIMS INCLUDING CLAIMS NOT REFERENCED IN THE DISCLOSURE STATEMENT.**

**THEREFORE, IN VOTING ON THE PLAN, NO CREDITOR MAY RELY ON THE ABSENCE OF AN OBJECTION TO ITS PROOF OF CLAIM AS ANY INDICATION THAT THE DEBTORS, THEIR ESTATES, REORGANIZED DEBTORS, OR OTHER PARTIES IN INTEREST ULTIMATELY WILL NOT OBJECT TO THE AMOUNT, PRIORITY, SECURITY, OR ALLOWABILITY OF SUCH CLAIM, OR SEEK TO SUBORDINATE SUCH CLAIM. CREDITORS SHOULD ASSUME INSTEAD THAT ANY SUCH PARTY THAT IS ENTITLED TO DO SO: (I) WILL FILE AN**

OBJECTION TO ANY PROOF OF CLAIM THAT IS NOT LISTED IN THE APPLICABLE DEBTORS' SCHEDULES, DIFFERS IN AMOUNT OR PRIORITY FROM THE AMOUNT OR PRIORITY OF SUCH CREDITOR'S CLAIM AS LISTED IN THE SCHEDULES, OR IF SUCH CREDITOR'S CLAIM IS LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, (II) WILL PROSECUTE ALL OBJECTIONS TO CLAIMS AND COUNTERCLAIMS THEY MAY HAVE WITH RESPECT TO CLAIMS ASSERTED, AND (III) EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, WILL PROSECUTE CLAIMS OF THE DEBTORS OR THE ESTATES (INCLUDING RIGHTS TO AFFIRMATIVE RECOVERY, RIGHTS TO SUBORDINATE CLAIMS, AND RIGHTS TO AVOID TRANSFERS).

      **11.**    **Avoidance Actions.**

Payments made by the Debtors within 90 days (and one year with respect to insiders) of the Petition Date may be recoverable under Bankruptcy Code section 547 as preferential transfers. Preferences are the most commonly prosecuted Avoidance Actions. A debtor-in-possession may recover a payment or other transfer of property made prior to its bankruptcy filing as preferential if that transfer: (a) was made to or for the benefit of a creditor, (b) on account of a debt owed prior to the payment, (c) at a time when the debtor was insolvent, (d) that allowed the transferee to receive more than it would have received had the transfer not been made and the debtor had been liquidated under chapter 7 of the Bankruptcy Code; and (e) was made during the 90 days immediately prior to its bankruptcy filing (or, if the transferee was an insider, during the one year immediately prior to the bankruptcy filing). A debtor is presumed to be insolvent within the 90 days preceding a bankruptcy filing. If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.

There are certain defenses to preference actions. For example, a transfer made in the ordinary course of the debtor's and transferee's business or according to ordinary business terms may not be recoverable. Furthermore, if the transferee gave, subsequent to the transfer, new value to the debtor (and for which the transferee was not paid), the new value constitutes an offset against the amount of any recovery. There are additional defenses.

Each Debtor filed its own Statement of Financial Affairs and certain Amendments (collectively, the "SOFA"). The SOFAs list payments made in the 90 days immediately preceding the Petition Date and a listing of all payments to insiders within one year of the Petition Date. Attached as Exhibit 4 are persons or entities identified by each Debtor as receiving potentially avoidable transfers during the pre-petition period. Payment made on account of a secured debt or not on account of an unsecured debt (such as joint interest billings, taxes or royalty payments, and retirement account payments) are not likely to be recoverable through Avoidance Actions. Each Debtor preserves the right to pursue Avoidance Actions and Causes of Action against any person or entity that received assets prior to the Petition Date as discussed in Section X(D) of this Disclosure Statement and Section III(C) of the Plan.

As discussed throughout the Disclosure Statement, Plan, and shown in Exhibit 4, the majority of payments were made by DJS, Inc., as the operating arm of DJS Co. LP and Kimbeto. After a thorough evaluation of pre-petition payments which may constitute preferential transfers under chapter 5 of the Bankruptcy Code, Debtors believe that their recoveries may be between $5,000 to $50,000. While the Debtors cannot estimate the recoveries with any precision due to possible defenses, they have used this spread in the Liquidation Analysis. While these recoveries are small, there would probably be little to no recovery at all for unsecured creditors without the Plan.

Under the Plan, the Avoidance Action Proceeds of each Debtor will be payable for the benefit of holders of Allowed General Unsecured Claims of that Debtor. The Reorganized Debtors will prosecute, settle, or dismiss the Avoidance Actions in their sole discretion as provided in Section III(C) of the Plan.

## VIII.
## SUMMARY OF MATERIAL PLAN PROVISIONS

The following is a narrative description of certain provisions of the Plan. The following summary of the Plan is qualified in its entirety by the actual terms of the Plan. In the event of any conflict, the Plan will control over any summary in this Disclosure Statement.

**A.      Designation of Classes and Treatment of Claims and Interests Generally.**

The Bankruptcy Code requires that a chapter 11 plan divide the different claims against and equity interests in a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated as "unclassified claims."

A chapter 11 plan must designate each separate class of claims and equity interests either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired" under the Bankruptcy Code, the holders of those claims are entitled to vote on the plan (unless the plan provides for no distribution to the class, in which case the class is deemed to reject the plan), and to receive, under the plan, property with a value at least equal to the value that the holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. If a class of claims is unimpaired, the holders of claims are deemed to accept the plan.

**B.      Distinction Between Secured Claims and Unsecured Claims and Valuation of Collateral.**

A claim may be divided between a "secured" and an "unsecured" claim under the Bankruptcy Code. A claim is secured only to the extent (i) that the lien securing such claim is valid and enforceable and (ii) of the value of the collateral securing the allowed portion of the claim. The rest of the claim is unsecured.

24

The Bank of Oklahoma has filed proofs of claim in each of the Debtors' cases for $9,269,863.04. It has also filed secured claims against DJS, Inc., for $266,000 and against DJS Co. LP for $320,000 related to letters of credit. Debtors believe that the treatment of the Bank of Oklahoma's claim fully satisfies their debts to the Bank of Oklahoma, and the Bank of Oklahoma has no unsecured claim.

DJS Co. LP has two other secured creditors, as discussed in Section VII(B)(2) and (3). Debtors' proposed treatment of those claims provides for full satisfaction of all debts, and no secured creditor holds an unsecured claim.

**C.      Summary of Classification and Treatment of Claims and Interests Under the Plan.**

The Plan is a joint Plan of the Debtors but neither they nor their Estates are being substantively consolidated. This means that each Debtor remains liable only for Claims against it and not for any Claims against the others. For example, nothing in the Plan makes DJS Co. LP liable for any DJS, Inc., Claims, and nothing makes DJS, Inc., liable for any DJS Co. LP Claims. The same is true regarding Kimbeto and the other two debtors.

This section summarizes the classification and treatment of Claims and Interests under the Plan for all purposes including voting, confirmation, and distributions under the Plan. It describes the treatment of Administrative Claims and Priority Tax Claims, which are not classified. A Claim or Interest is classified in a particular Class only if the Claim or Interest falls within the Class description. If part of the Claim or Interest falls within a different Class description, that portion of Claim or Interest is classified in that different Class.

| CLASS OF CLAIMS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | TREATMENT | VOTING STATUS |
|---|---|---|---|---|
| Unclassified Claims | U.S. Trustee Fees, Professional Fee Claims, Administrative Claims, Priority Claims, and Priority Tax Claims | Unimpaired | Payment in full on the Distribution Date or according to terms of the obligation if due later, unless the Holder agrees to different treatment. | Not Permitted to Vote |
| Class 1.A | Secured Claim of Bank of Oklahoma | Impaired | Transfer ownership of secured collateral and payment of $250,000 in full satisfaction of debts owed by all Debtors. | Permitted to Vote |
| Class 1.B | Secured Claim of Four Corners Community Bank | Impaired | Transfer of ownership of portion of secured collateral. Remaining balance of debt paid over time with cash deferred payments at a | Permitted to Vote |

25

| | | | market interest rate, payment in full or transfer of encumbered property within one year. | |
| Class 1.C | Secured Claim of Crane/Adams Trust | Impaired | Paid over time with cash deferred payments at a market interest rate, payment in full within 5 years. | Permitted to Vote |
| Class 1.D | Other Secured Claims Not Otherwise Classified | Unimpaired | Any Allowed Claims are paid in full according to contractual terms. | Not entitled to Vote |
| Class 2 | JOA Claims | Impaired | Paid over time with payment in full as sufficient revenue is generated. | Permitted to Vote |
| Class 3 | Oil and Gas Royalty and Lease Payments | Impaired | Paid in full 90 days after the Effective Date. | Permitted to Vote |
| Class 4.A | General Unsecured Claims against DJS Co. LP | Impaired | Paid over time with monthly payments distributed on a pro rata basis, all claims satisfied in full within 5 years through payment of 60% of each holder's allowed claim. | Permitted to Vote |
| Class 4.B | General Unsecured Claims against DJS, Inc. | Impaired | Paid over time with monthly payments distributed on a pro rata basis, all claims satisfied in full within 5 years through payment of 60% of each holder's allowed claim. | Permitted to Vote |
| Class 4.C | General Unsecured Claims against Kimbeto | Impaired | Paid over time with monthly payments distributed on a pro rata basis, all claims satisfied in full within 5 years through payment of 60% of each | Permitted to Vote |

DOCS-#5579684-v3

| | | | holder's allowed claim. | |
|---|---|---|---|---|
| Class 5 | Interests | Unimpaired; or Impaired | Equity interest Holders retain their Interests if all senior Claims are fully satisfied under terms of the Plan. If all claims are not fully satisfied, equity interests shall be cancelled and the Reorganized Debtors' property will be liquidated. | Not Permitted to Vote; or Deemed to Reject – Vote Not Solicited |

Except as otherwise expressly provided in the Plan, the treatment of Claims and Interests in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including Liens) that each Holder of an Allowed Claim or an Allowed Interest may have in or against the applicable Debtor, its Estate, any of the Reorganized Debtors, or their respective property. This treatment supersedes and replaces any agreements or rights those Holders may have in or against the Debtors, their Estates, the Reorganized Debtors, or their respective property.

**1.      Allowance and Treatment of Unclassified Claims.**

      **a.      Administrative Claims.**

          **(1)      Trustee Fees.**

U.S. Trustee Fees shall be Allowed in accordance with 28 U.S.C. § 1930. The Reorganized Debtors will pay to the U.S. Trustee all fees due and owing by each of them under 28 U.S.C. § 1930 in cash on the Distribution Date.

          **(2)      Professional Fee Claims.**

A Professional Fee Claim will be Allowed only if:

      i.      On or before sixty (60) days after the Effective Date, the Holder of such Professional Fee Claim files with the Court a final fee application or a motion requesting allowance of the fees, and serves the application or motion on all parties entitled to notice under applicable law; and

      ii.      The Court allows the Claim pursuant to a Final Order.

**Any Holder of a Professional Fee Claim that does not timely file and serve a fee application or motion for payment thereof will be forever barred from asserting such**

27

**Claim against the Debtors, their Estates, the Reorganized Debtors, or their respective property.**

Each Reorganized Debtor will pay or cause to be paid each of its Allowed Professional Fee Claims (a) in cash within thirty (30) days after the date on which the Bankruptcy Court allows such Claim pursuant to a Final Order, or (b) on such other terms as may be mutually agreed between the Holder of such Professional Fee Claim and the applicable Reorganized Debtor.

### (3)    Administrative Claims.

Unless a Debtor otherwise agrees, each Holder of an Administrative Claim must file a motion requesting allowance of such Administrative Claim and obtain a Final Order. Unless a party with standing objects to the motion, such Administrative Claim will be Allowed under the terms and conditions of the particular transaction that gave rise to the Administrative Claim, subject to all defenses, rights of recoupment, offsets, and other rights arising under any agreements between the Holder of such Claim and the applicable Debtor. An Administrative Claim will be Allowed only if:

　i.　**By November 28, 2016** (the Administrative Claim Deadline), the Holder files with the Court a motion requesting allowance of such Claim, and serves the motion on the applicable Debtor's Counsel, the U.S. Trustee, and others entitled to notice under applicable law; and

　ii.　the Court allows the Administrative Claim pursuant to an Order entered on or before the Confirmation Date.

Any objection to a motion for allowance of an Administrative Claim must be filed within 21 days of service. If an objection is timely filed, unless the parties agree otherwise, the motion and objection shall be heard as part of the Confirmation Hearing, if not earlier, and Allowed or Disallowed at that time. **Any party holding an Administrative Claim that does not timely file and serve a motion requesting allowance by November 28, 2016, will be forever barred from asserting an Administrative Claim against the Debtor, the Estate, Reorganized Debtors, or their respective property.**

Unless the Holder of an Allowed Administrative Claim agrees to different treatment, the applicable Reorganized Debtor will pay such Claim in cash by the later of (a) the Distribution Date or (b) thirty days after the date on which such Claim is Allowed by a Final Order.

### b.    Priority Tax Claims.

At the election of the applicable Reorganized Debtor, each Allowed Priority Tax Claim (i) will be reinstated and paid on the date that such Allowed Priority Tax Claim first becomes due under its terms, (ii) will be paid Cash in the amount of such Allowed Priority Tax Claim on the Distribution Date, (iii) will be satisfied with a promissory note equal to the amount of such Allowed Priority Tax Claim, bearing interest accruing from the Effective Date at the rate

28

applicable under Bankruptcy Code section 511 (or, if no such rate is established in conjunction with the Confirmation Hearing, the 10-Year Treasury Yield in effect on the Effective Date) payable in equal quarterly installments beginning on the last day of the first full calendar quarter following the Effective Date, maturing no later than the fifth (5th) anniversary of the Petition Date, or (iv) will be paid on such other terms as the Reorganized Debtor and the Holder agree.

2.     **Allowance and Treatment of Classified Claims.**

a.     **Class 1.A (Secured Claims of the Bank of Oklahoma).**

All Debtors owed the same debt to the Bank of Oklahoma. The Bank of Oklahoma has filed proofs of claim for a total amount of $9,855,863.04. The Debtors will satisfy their debt to the Bank of Oklahoma's claims on the Distribution Date by: (i) transferring all collateral securing the Bank of Oklahoma's debt and (ii) making a monetary payment of $250,000. Through these two transfers on the Distribution Date, the Bank of Oklahoma's $9,855,863.04 claim will be fully satisfied and the Bank of Oklahoma does not have an unsecured claim. Class 1.A is Impaired and may vote to accept or reject the Plan.

b.     **Class 1.B (Secured Claim of Four Corners Community Bank).**

Four Corners Community Bank is an oversecured creditor (the "FCCB Secured Claim"). Four Corners Community Bank ("FCCB") filed its claim for $930,491.48. DJS Co. LP has conferred with FCCB and advised its belief that the allowed claim should be $904,561.48. DJS Co. LP will first provide a good and sufficient quitclaim deed for a portion of its secured collateral, commonly known as the parking lot, which will lower the FCCB Secured Claim by $225,000. DJS Co. LP will continue its efforts to sell the remaining collateral securing the FCCB Secured Claim, commonly known as the office building, for 12 months from and after the Effective Date. Starting on the Distribution Date, DJS Co. LP will provide FCCB with monthly interest-only payments at a 4% simple interest rate per annum during this period. The principal debt owed to FCCB after transferring the parking lot, which will be used to calculate the monthly interest-only payments, is $679,561.48. After closing of a sale of the office building, the outstanding balance of the FCCB Secured Claim shall be paid in full. If the office building is not sold during such 12-month period, then, on the first (1st) of the month following, DJS Co. LP will at its election pay the FCCB Secured Claim in full, or provide a good and sufficient quitclaim deed to Four Corners Community Bank in full satisfaction of the FCCB Secured Claim. Finally, DJS Co. LP will provide payment to FCCB for its reasonable attorneys' fees incurred after May 22, 2016, within (i) 30 days of the Distribution Date unless otherwise agreed to by FCCB or (ii) 30 days after the Court determines the reasonableness of the attorneys' fees, whichever is earlier. Through these transfers or payments, FCCB will be fully satisfied and FCCB does not have an unsecured claim. Claim 1.B is Impaired and may vote to accept or reject the Plan.

c.     **Class 1.C (Secured Claim of Crane/Adams Trusts).**

Class 1.C comprises the Allowed Secured Claim of the Gordon Neal Crane and Dorcan Ann Crane Living Trust & Donald C. Adams Revocable Trust. The Crane/Adams Trusts will

29

maintain its Liens against its pre-petition collateral, and starting on the Distribution Date, will receive monthly interest-only payments at 6% simple interest rate per annum for 5 years. A balloon payment of approximately $142,975 will be made in full satisfaction of this Allowed Secured Claim by January 31, 2022, but it may be made earlier without penalty. Through these payments, the Crane/Adams Trusts will be satisfied in full and the Crane/Adams Trusts does not have an unsecured claim. Class 1.C is Impaired and may vote to accept or reject the Plan.

### d.     Class 1.D (Other Secured Claims Not Otherwise Classified).

Creditors asserting Claims in this class include: Jackson Family Trust (O&G Royalty claims that are classified and must vote in Class 3), the Travelers Indemnity Company (unimpaired), Delmar Holdings, LP (JOA claims that are classified and must vote in Class 2), and the Oil Conservation Division, NM Energy, Minerals and Natural Resources Department (unimpaired).

Creditors in this class filed Secured Claims against one or more Debtors. The applicable Debtor disputes these Claims and in some circumstances believes the Claims are more appropriately classified within other classes. Accordingly, those Claimants may vote on the Plan in another class as set forth above. However, if any Claims in Class 1.D are Allowed as Secured Claims by the Court, the applicable Debtor agrees to satisfy the Allowed Secured Claim, at its election, by payment in full or return of the collateral securing the Claim. If a creditor in Class 1.D filed a Claim because it is secured to a certain extent for an obligation that has not become due (such as a bond for plugging or abandoning wells or insurance claims), after the Confirmation Date it will retain any previously granted and perfected security interest because the Debtors will continue to operate under the applicable security interest or regulations related to its operations. Any such Class 1.D Allowed Claim is therefore unimpaired and not entitled to vote on the plan.

### e.     Class 2 (JOA Claims).

Creditors in Class 2 are parties to joint operating agreements and conduct joint operations with one or more Debtors. Under certain agreements with applicable Debtors, Class 2 claimants have been granted security interests that may or may not have been perfected. Class 2 Claimants may be secured for the full amount or a certain portion of their Claims. But, the agreements and obligations are ongoing and Debtors will continue to perform after the Confirmation Date. Class 2 Claimants will be paid in full by recouping or offsetting revenue and income otherwise owed to one or more Debtors under the applicable JOA. Once paid in full, Claimants in Class 2 shall transfer all revenue and income thereafter owed under their respective JOAs to the applicable Reorganized Debtor.

Creditors in this class are: ConocoPhillips, RKI, Thompson Engineering & Production Co., and Dugan Production. Their Claims are Impaired and they may vote to accept or reject the Plan.

30

      **f.**      **Class 3 (Oil and Gas Royalty and Lease Payment Claims).**

The Debtors' oil and gas leases have been or are being assumed hereunder, to the extent Section 365 of the Bankruptcy Code applies. The Debtors assert that all lease and royalty payments are current. Debtors will not pay royalty or working interest holders until 90 days after the Effective Date. Debtors will satisfy all Allowed Class 3 Claims by Cash payments on or before 120 days from the Effective Date. The Debtors do not concede the validity of any lease or royalty payment and reserve the right to contest any such payment in a court of appropriate jurisdiction.

      **g.**      **Class 4 (General Unsecured Claims).**

The Class 4 Claimants are separated based on claims against each Debtor. Each will be treated the same under the Plan, and will receive Pro Rata the Avoidance Action Proceeds from any Avoidance Actions prosecuted and/or settled by a Reorganized Debtor. No allocation among the Debtors of the Avoidance Action Proceeds has yet been made. That allocation will be made during each settlement or judgment.

In addition to any recoveries appropriately allocated from Avoidance Action Proceeds, the Class 4 Claimants will be paid 60% of their Allowed Claim in full satisfaction of any claim or debt owed. Attached **Exhibit 7** lists all Class 4 General Unsecured Claims and the proposed treatment to pay 60% of each claim in full satisfaction of each respective claim. Notwithstanding this provision, each Reorganized Debtor may negotiate a lower payment in full satisfaction of the claim with the respective claimant's written consent. If Class 4 Claimants are not satisfied in full by January 31, 2022, Debtors' assets will be liquidated and Class 4 Claimants will receive a Pro Rata distribution of any funds available to pay Class 4 Claims. The Debtors' right to object to any Claim on any ground shall be reserved. Class 4 Claims are Impaired and may vote to accept or reject the Plan.

      **h.**      **Class 5 (Current Equity).**

If all previous classes, which are senior to the current equity, are not satisfied in full, the current Interests in each Debtor will be cancelled and receive nothing. As stated in Section III(H) of the Plan, an independent person or entity will be appointed to liquidate the Reorganized Debtors in such event. If Claims of all senior classes are paid or otherwise satisfied in full as contemplated by the Plan, current equity will retain its Interest in the Reorganized Debtors. Until the date that all senior classes are satisfied in full, no distribution or payment will be made to equity holders on account of their Interest. Under either scenario, Class 5 is not entitled to vote.

## IX.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, the Debtors shall reject all executory contracts and unexpired leases except for those previously assumed or those listed on the Schedule of Assumed Contracts and Leases. The Debtors do not believe that Oil and Gas leases or Surface Use and Right of Way Agreements are subject to 11 U.S.C. § 365, but, in an abundance of caution, Debtors will assume

these leases and agreements (to the extent they are determined to be leases or executory contracts under section 365(d) of the Bankruptcy Code). Debtors believe the Plan provides adequate assurance of future performance. If you are a party to a contract or lease on the Schedule of Assumed Contracts and Leases, you are notified that Debtors will provide no Cure Payments because there is adequate assurance of future performance.

Debtors intend to assume all Federal Lease Interests to continue to operate certain oil and gas properties. Debtors have conferred with the DOI, on behalf of the ONRR, regarding assumption of federal leases. On September 12, 2016, the Court granted Debtors' motion to extend the time period for assumption of these leases, with DOI and ONRR's consent, to December 31, 2016. (Docket No. 201). Section II of the Plan discusses assumption of the Federal Lease Interests, and Debtors believe that the DOI and ONRR will consent to the assumption of these Federal Lease Interests and continue to cooperatively work with the Debtors to identify the appropriate amount owed to ONRR so this debt will be satisfied in full. Debtors agreed to include certain language in the Plan at the request of DOI and ONRR, as provided in Section II(A) in the Plan.

If you are a party to a contract or lease on the Schedule of Assumed Contracts and Leases and you dispute (i) the nature or amount of any Cure Payment, (ii) the ability of the Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, you must file and serve an objection by **November 28, 2016.** The objection must contain specific language on the nature of your objection and state the amount you claim is required to cure any default under the contract. Failure to file and serve such objection will be your consent to the assumption in the Schedule and you will have no further right to claim any additional default, or claim a different cure amount under the Plan. If your objection is sustained, a Cure Payment shall be made in the amount determined by a Final Order of the Bankruptcy Court; provided, however, that each Debtor may reject at any time prior to the entry of the Confirmation Order any executory contract or unexpired lease to the extent it concludes that the Cure Payment determined by such Final Order renders assumption of such executory contract or unexpired lease unfavorable to it.

On the Effective Date, the Debtors, except as to those executory contracts or unexpired leases already assumed or in the Schedule of Assumed Contracts and Leases or any Federal Lease Interest not listed in the Schedule of Assumed Contracts, will reject all other executory contracts or unexpired leases. If you are a party to such a contract or lease you will have thirty (30) days after the Effective Date within which to file a proof of claim with the Court for damages, if any, which you claim arise out of such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, and their property.

32

**X.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**A.**     **Funding of the Plan.**

All obligations of each of the Reorganized Debtors under the Plan will be paid, caused to be paid, or satisfied in full, by such Reorganized Debtor from one or more transfers of its property, cash on hand in its Estate, revenue and other income from the Reorganized Debtors' operations or other assets, the cash proceeds generated from sales of Debtors' encumbered and unencumbered assets, which will be conducted in their discretion and as necessary, and proceeds from the Avoidance Actions. Any sale of encumbered assets requires proceeds to be paid to the secured claimants absent their express written consent for the applicable Debtor to otherwise use the proceeds. Creditors are encouraged to review the financial information attached to the Disclosure Statement.

**B.**     **Post-Confirmation Operations.**

Debtors will transfer the oil and gas properties secured by the Bank of Oklahoma's debt to the Bank of Oklahoma. DJS, Inc. proposes to continue to act as the operator on those properties. After Debtors fully satisfy their obligations owed to Bank of Oklahoma, Debtors will act as an operator on an expense-only basis and net revenue will be transferred to the Bank of Oklahoma. Debtors will maintain ownership and continue their operations on unencumbered oil and gas properties after the Confirmation Date, and those properties will vest in the applicable Reorganized Debtor. Unlike the prepetition period, DJS Co. LP and Kimbeto, as applicable, will not pay DJS, Inc. management fees for its work as the operator during the post-confirmation period.

**C.**     **Vesting of Assets Generally.**

Except as otherwise provided in the Plan, on the Effective Date, all property of each Estate shall vest in the applicable Reorganized Debtor and be free and clear of all Claims, Liens, encumbrances and interests other than the Allowed Secured Claims. After the Effective Date, each Reorganized Debtor may operate its business and use, acquire, sell, and dispose of property without supervision by the Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than those restrictions imposed by the Plan or Confirmation Order. Any Avoidance Action Proceeds shall be paid to Holders of Class 4 General Unsecured Claims as applicable.

**D.**     **Preservation/Vesting of Rights of Action.**

Except as expressly released or otherwise provided under the Plan, under Bankruptcy Code section 1123(b), each Reorganized Debtor shall be vested on the Effective Date with and shall retain and may enforce any and all Rights of Action that any Debtor or its Estate may hold or have against any entity, including (i) the Avoidance Actions, (ii) any legal or equitable rights to subordinate and/or disallow Claims, (iii) any claims, rights, or actions against any Holder of Claims or Interests unless precluded by deadlines previously set by the Court, (iv) any derivative

33

Rights of Action that may be brought by such Debtor, and (v) any and all other Rights of Action of any kind or nature of such Debtor or its Estate that may exist because of applicable bankruptcy law or nonbankruptcy law (collectively, the "Retained Actions"). Except as expressly released or otherwise provided under the Plan, upon the Effective Date, the applicable Reorganized Debtor, and only such Reorganized Debtor, shall have standing to assert its Retained Actions and it may prosecute, abandon, settle or otherwise dispose of any Retained Action in its sole discretion. Regarding the Avoidance Actions, each Reorganized Debtor shall prosecute, abandon, settle, or otherwise dispose of its Avoidance Actions in its discretion. Each Debtor specifically preserves its Retained Actions against each person or entity identified in the Disclosure Statement and any entity identified as receiving assets pre-petition in any Debtor's Schedules.

## E.    Claim Objections.

Except as provided in Section I(A)(1)(a)(3) of the Plan (regarding allowance of Administrative Claims), objections to any Claim shall be filed and served upon the Holder no later than the Claim Objection Deadline.

On and after the Effective Date, the Reorganized Debtors shall have the exclusive authority to initiate, prosecute, compromise, abandon, or otherwise dispose of any Claim Objection.

## F.    Distribution of Property Under the Plan.

The following procedures apply to monetary distributions made under the Plan by each applicable Reorganized Debtor:

Each Reorganized Debtor shall make the distributions it is required to make under the Plan. To the extent required by applicable law, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions under the Plan shall be subject to such withholding and reporting requirements. The applicable Reorganized Debtor may withhold the entire Cash distribution due to any Holder of an Allowed Claim until such Holder provides the information to comply with any withholding requirements of any Governmental Unit.

### 1.    Manner of Cash Payments Under the Plan.

Cash payments on account of Allowed Claims will be tendered in United States dollars and will be made by checks drawn on a United States domestic bank or by wire transfer from a United States domestic bank. Any domestic Holder of an Allowed Claim that wishes to receive a Cash payment by wire transfer shall provide wire instructions to the applicable Reorganized Debtor. In any such case, the Reorganized Debtor shall make the Cash payment(s) by wire transfer in accordance with the wire instructions, and the costs of such wire transfer shall be deducted from such Holder's distribution.

34

### 2. No De Minimis Distributions.

Except for payments to Class 3 (Oil and Gas Royalty and Lease Payment Claims), no Cash payment of less than $10 will be made to any entity. No consideration will be provided in lieu of the de minimis distributions not made under this Section.

### 3. No Distribution Regarding Disputed Claims.

No payments of Cash, distributions of other property, or other consideration of any kind shall be made on account of any Disputed Claim unless or until such Claim becomes an Allowed Claim or is deemed to be such for purposes of distribution. Unless otherwise provided in the Plan, any Holder of a Claim that becomes an Allowed Claim after the Effective Date will receive any distribution it would have received had its Allowed Claim been Allowed as of the Effective Date within thirty (30) days from the date such Claim becomes an Allowed Claim.

### 4. Delivery of Distributions and Undeliverable/Unclaimed Distributions.

#### a. Delivery of Distributions in General.

Each Reorganized Debtor shall make distributions to each Holder of an Allowed Claim by mail: (a) at the address set forth on the Proof of Claim filed by such Holder, (b) at the address set forth in any written notice of address change delivered to the Reorganized Debtor after the date of any related Proof of Claim, or (c) at the address reflected in the Schedules if no Proof of Claim is filed and the applicable Reorganized Debtor has not received a written notice of a change of address. To the extent the Debtor or Reorganized Debtor has no current address for the Holder of an Allowed Claim, the Reorganized Debtor shall withhold the remittance of any distribution to such Holder unless it is notified in writing of such Holder's then current address.

#### b. Undeliverable and Unclaimed Distributions.

If a distribution remitted to a Holder of an Allowed Claim is returned as undeliverable, no further distribution shall be made to such Holder unless and until the applicable Reorganized Debtor is notified in writing of such Holder's then current address. Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the applicable Reorganized Debtor until such time as a distribution becomes deliverable. All undeliverable cash distributions will be held in the Reorganized Debtor's regular bank accounts.

Any Holder of an Allowed Claim who fails to assert a demand in writing for any undeliverable distribution within two (2) years after such distribution was first made shall no longer have any right to or interest in such undeliverable distribution, and any such right or interest will be deemed fully satisfied.

Any undeliverable distributions on Allowed Claims not claimed under this Section will be retained by the applicable Reorganized Debtor.

35

### c. Estimation of Disputed Claims for Distribution Purposes.

Any Reorganized Debtor may move for a Bankruptcy Court order estimating any Disputed Claim. The estimated amount of any Disputed Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the Holder thereof may recover under the Plan. If a Reorganized Debtor seeks an order estimating a Disputed Claim to maintain an appropriate reserve in connection with a distribution, the estimated amount of such Disputed Claim shall be the amount set forth in the Proof of Claim evidencing the Disputed Claim (or in a Debtor's Schedules if no Proof of Claim has been filed).

### G. Setoff, Recoupment and Other Rights.

Notwithstanding anything to the contrary in the Plan, any Reorganized Debtor may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the distributions to be made under the Plan on account of any Allowed Claim, any Claims that any Debtor, any Estate, or any Reorganized Debtor have against the Holder of the Allowed Claim; provided, however, that the failure to effect such a setoff or recoupment, the failure to assert counterclaims or withhold distributions, or the allowance of any Claim against any Debtor, any Estate or any Reorganized Debtor, or any partial or full payment during the Cases or after the Effective Date regarding any Allowed Claim, shall not constitute a waiver or release by such Debtor, any Estate, nor the Reorganized Debtor of any Claim that any of them may possess against such Holder.

### H. Management of the Reorganized Debtors.

After the Confirmation Date, the members and manager of the Debtor that served prior to the Confirmation Date shall continue to serve unless they have already resigned or the respective Debtor has terminated their employment. Debtors have advised of pre-Confirmation Date changes in management in Section VII(C) of the Disclosure Statement. After the Effective Date, all Articles of Organization, Operating Agreement, or other corporate documents shall remain effective. The same board of directors and equity security holders for each Debtor will continue to serve after the Confirmation Date. These persons or entities are listed in Exhibit 6 to this Amended Disclosure Statement. Debtors do not intend to amend their corporate documents in compliance with 1123(a)(6) of the Bankruptcy Code, as that provision relates to the issuance of non-voting equity shares.

### I. Appointment of Liquidator.

If the Class 4 Claimants are not paid in full or otherwise fully satisfied by January 31, 2022, the Debtors' management will appoint Alex G. Smith and Alliance Management as an independent fiduciary to liquidate remaining assets. If Alliance Management is unable to act in this capacity, Debtors' current President, Rodney Seale, will select an independent fiduciary, with receivership, bankruptcy trustee, or similar experience, and this individual or entity will windup remaining property of the Debtors and make distributions as required by the Bankruptcy Code or applicable non-bankruptcy law. The Debtors will dissolve each entity under applicable state law.

**J.      Post-Confirmation U.S. Trustee Fees and Professional Fees.**

To the extent U.S. Trustee Fees are due and owing under 28 U.S.C. § 1930 by any Reorganized Debtor after the Confirmation Date but prior to the entry of a final decree closing the Case, such Reorganized Debtor shall be obligated to pay such fees. Any accountant, consultant, attorney, independent fiduciary such as Alliance Management, or professional employed by the Debtors after the Effective Date shall not file fee applications for services rendered. Such fees shall be paid by the Debtors, or the independent fiduciary as appropriate, in the ordinary course of business.

**XI.**
**EFFECT OF CONFIRMATION OF THE PLAN**

**A.      Revesting of Assets.**

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property or interests in property comprising any Debtor's Estate shall revest in the applicable Reorganized Debtor free and clear of all Claims, Liens, charges, encumbrances, rights, and interests of creditors and equity security holders other than the Allowed Secured Claims and subject to the Plan provisions requiring compliance with certain obligations to avoid default or liquidation. As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than those restrictions imposed by the Plan and the Confirmation Order.

**B.      Binding Effect of Plan/Full Satisfaction and Release of Claims/Discharge of Debtors.**

Under section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of any and all Claims, including, but not limited to, Claims, Administrative Claims, Professional Fee Claims, and causes of action (whether known or unknown) against, liabilities of, liens on, obligations of, rights against, and Interests in any Debtor or the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained under the Plan on account of such Claims, rights, and Interests including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of any Debtor prior to the Petition Date and that arise from a termination of employment or a termination of any employee which occurred prior to the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code in each case whether (a) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in any Debtor subject to the occurrence of the Effective Date.

37

### C.     Compromises and Settlements.

Under section 1123(b) of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have regarding any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, and a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. Under the Plan, and pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 with no further notice to or action, order, or approval of the Bankruptcy Court after the Effective Date, any Reorganized Debtor may compromise and settle Claims against it and Causes of Action against other entities.

### D.     Releases and Related Matters.

On the Effective Date, to the extent permitted by applicable law, each Holder of a Claim is also deemed to forever release and waive all claims against the Released Parties in connection with or related to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Cases, or the Plan (other than the rights under the Plan or reserved in the Plan); *provided that* nothing in the Plan shall be deemed to prohibit any party from asserting or enforcing claims resulting from willful misconduct, self-interested transactions or intentional tort, or a third party personal guaranty of an obligation. Debtors are unaware, however, of any personal guaranties executed by officers, directors, or insiders regarding Debtors' debts.

### E.     Permanent Injunction.

The Plan and the Confirmation Order approving the same shall permanently enjoin all proceedings for the collection of any Claims against the Debtors arising prior to the Effective Date, unless specifically modified by any order of the Bankruptcy Court, entered after notice and hearing, unless and to the extent that injunction is terminated under the Plan. The permanent injunction does not apply to actions to collect pre-petition or post-petition debts owed by third parties.

### F.     Environment Issues and Discharge or Injunction Related to Governmental Unit "claims".

The Department of Justice ("DOJ"), representing the Environmental Protection Agency, has conferred with Debtors regarding certain environmental issues and claims. Debtors have agreed to include certain language at the DOJ's request. This language is in Section IV(F) of the Plan and is copied in the following paragraph.

Nothing in the Confirmation Order or this Plan discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27)

38

("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date: (iii) any police or regulatory liability to a Governmental Unit that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized Debtors. Nor shall anything in the Confirmation Order or this Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Nothing in this Order or the Plan shall affect any setoff or recoupment rights of any Governmental Unit.

## XIII.
## FINANCIAL PROJECTIONS AND FEASIBILITY

Exhibit 2 hereto provides financial projections for the Debtors and Reorganized Debtors, (collectively, the "Projections"). The Projections show financial information on a consolidated monthly basis following the anticipated Effective Date through the end of 2021. The Projections have been prepared under the direction of the Debtors and show the revenue that the Debtors will receive after transferring certain oil and gas properties to the Bank of Oklahoma and fully satisfying their debt owed to the Bank of Oklahoma. Remaining revenue and proceeds from unencumbered assets (or from proceeds of secured collateral to satisfy the respective secured creditors' claim), whether through sales or otherwise, will be used to fully satisfy (i) secured creditor Four Corners Community Bank by January 2018, (ii) secured creditor Crane/Adams Trust by January 2022, and (iii) unsecured creditors by January 2022. Debtors have included the potential payment to the ONRR and projected the payment based on the ONRR claim but dispute that the amount stated is allowable. Debtors, however, have been negotiating with the DOI and ONRR and understand that payment of the ONRR claim, in an amount not yet fully determined, may be required earlier than projected under 11 U.S.C. § 365 and Debtors' proposal to assume the Federal Leases.

To the best of the Debtors' knowledge, the Projections present the expected financial results of the Debtors and Reorganized Debtors for the periods projected, subject to the various assumptions set forth therein. The estimate of revenue uses pricing from the current CME/NYMEX settlement price adjusted for local pricing. Readers are urged to review the Projections carefully and to consult with their own financial and legal advisors regarding the same.

The Projections are based upon a variety of estimates and assumptions, which though considered reasonable when they were prepared, may not be realized and are inherently subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of the Projections or Reorganized Debtors' ability to achieve the projected or illustrated results. Some assumptions may not materialize, and events and circumstances may differ materially from those assumed. The Projections therefore should not be relied upon as a guarantee or other assurance of the actual results that will occur. (See Section XV for a more detailed explanation of the risk factors associated with the business of the Reorganized Debtors, the Plan, and the Projections).

39

## XIV.
## LIQUIDATION ANALYSIS AND "BEST INTERESTS" TEST

Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or Interest in an Impaired Class either (i) vote to accept the Plan, or (ii) receive or retain under the Plan cash or property of a value as of the effective date of the Plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. This is referred to as the "best interests of creditors" test.

In a chapter 7 case, a trustee would be elected or appointed to liquidate Debtors' assets for distribution to creditors under the priorities in the Bankruptcy Code. Secured creditors generally are paid from the proceeds of sale of the properties securing their Liens. If any assets are remaining after the satisfaction of secured claims, administrative expenses generally are next to receive payments. Unsecured claims are paid from any remaining sales proceeds according to their rights to priority. Unsecured claims with the same priority share in proportion to the amount of their allowed claim in relation to the total amount allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are fully satisfied.

For the Court to confirm the Plan, the Court must find that all creditors and shareholders who do not accept the Plan will receive at least as much under the Plan as they would receive under a hypothetical chapter 7 liquidation.

The Debtors' liquidation analysis is attached as Exhibit 3 ("Liquidation Analysis"). The liquidation analysis shows that the holders of General Unsecured Claims would receive no more than a 10.03% distribution if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Conversion of a case to chapter 7 carries inherent additional costs, risks of significant decline in asset values, and duplication of effort. Conversion to chapter 7 would severely reduce the value of the Debtors' assets.

The Debtors have estimated the liquidation value of their assets based upon the most accurate information currently available. Because those estimates are a prediction of what could be obtained if such assets were liquidated, there is no way to guarantee that the estimates are entirely accurate. The actual liquidation of the assets might generate either more or less than the estimated values in the Liquidation Analysis.

## XV.
## RISKS

The Debtors' ability to perform their obligations under the Plan is subject to various factors and contingencies, some of which are described in this section. The following discussion summarizes only some material risks associated with the Plan and the Reorganized Debtors but is not exhaustive. Each Claim holder and Interest holder should supplement the following discussion by analyzing and evaluating the Plan and the Disclosure Statement as a whole. THE RISKS ASSOCIATED WITH THE PLAN AND THE REORGANIZED DEBTORS MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

DOCS-#5579684-v3

This discussion assumes that the Plan is confirmed and that the Effective Date occurs.

**A.    Certain Bankruptcy Considerations.**

**1.    Undue Delay in Confirmation May Significantly Disrupt the Operation of the Debtors.**

The impact that a prolonged confirmation process may have on the operations of the Debtors cannot be accurately predicted or quantified. Continuation of the Cases for an extended period of time, particularly if the Plan is not promptly approved, could adversely affect the Debtors' operations and relationships with its vendors, employees, customers, and regulators. It also increases Professional Fee Claims.

Prolonging the confirmation process may also make it more difficult for the Debtors to retain and attract management and other key personnel and would require senior management to spend significant time and effort dealing with the Debtors' reorganization instead of focusing on the operation of the Debtors' business.

**2.    The Debtor May Object to the Amount, Security or Priority Status of a Claim.**

The Debtors reserve the right to object to the amount, the secured status, or priority status, of any Claim or Interest. The estimates in the Disclosure Statement cannot be relied on by any creditor or equity holder whose Claim or Interest is subject to an objection. Any such holder of a Claim or Interest may not receive a share of the contemplated distributions described in the Disclosure Statement.

**B.    Risks Related to Reorganized Debtors' Business and Financial Condition.**

**1.    Financial Forecasts.**

The Reorganized Debtors may not meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting the Reorganized Debtors' future business prospects (see Exhibit 2). If the Reorganized Debtors do not achieve the projected revenue or cash flow levels due to certain assumptions not occurring or otherwise, they may lack sufficient liquidity to continue operating as planned after the Effective Date. The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations. The Projections do not, however, guarantee the Reorganized Debtors' future financial performance.

**2.    Natural Gas and Oil Price Declines and Volatility Could Adversely Affect the Reorganized Debtors' Income.**

Prices for gas and oil fluctuate widely and were a significant cause of this bankruptcy. The availability of a ready market for oil and gas production depends on numerous factors beyond the control of the Reorganized Debtors, including the demand for and supply of oil and gas, the proximity of our natural gas reserves to pipelines, the capacity of such pipelines,

41

fluctuations in production and seasonal demand, the effects of inclement weather, governmental regulation, the price and availability of alternative fuel sources, and overall economic conditions. New gas wells may be shut in for lack of a market until they are no longer uneconomical. Successful exploration wells may have production delayed depending on economic conditions.

### 3.      The Oil and Gas Industry Has Numerous Operating Risks.

The oil and gas business involves a variety of operating risks, including but not limited to: fires and explosions; uncontrollable flows of oil and gas; mechanical failure in a well or gathering system; natural disasters; and environmental hazards such as spills, pipeline ruptures and discharges of toxic gases.

If any of these events occur, the Reorganized Debtors could incur substantial losses because of: injury or loss of life; severe damage to and destruction of property, natural resources, and equipment; pollution or other environmental damage; regulatory investigation and penalties; cleanup responsibilities; suspension of operations; repairs to resume operations; and loss of productive energy.

The Reorganized Debtors will maintain insurance against some, but not all, potential risks and losses affecting operations. There can be no assurance that the insurance will be adequate to cover all losses or liabilities. Also, the continued availability of insurance at current costs cannot be assured.

### 4.      The Oil and Gas Industry is Subject to Regulation.

Exploring for, producing and selling gas and oil are subject to a variety of federal, state, local, and international governmental regulations, including regulations concerning the discharge or emission of materials into the environment, the conservation of natural gas and oil production, permits for drilling, production, and transportation operations, drilling and plugging, abandonment bonds and other financial assurances, calculation of royalties and production taxes, reports concerning operations, the spacing of wells, the unitization and pooling of properties, the cleanup of well sites, and various other matters, including taxes. Laws and regulations protecting the environment are stringent and may in certain circumstances impose strict and joint and several liability, rendering a person liable for environmental damage without regard to negligence or fault by such person. Such laws and regulations may expose the Reorganized Debtors to liability for the conduct of operations or conditions caused by others or for the acts of the Debtors. Environmental laws generally provide for civil, criminal and administrative penalties for noncompliance, including any unauthorized discharges of oil and other hazardous substances.

## XVI.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the legal alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code, (ii) an alternative chapter 11 plan, and (iii) dismissal of the Cases.

**A.      Liquidation under Chapter 7.**

If no plan can be confirmed, the Case may be converted to a case under chapter 7 of the Bankruptcy Code. A chapter 7 trustee would liquidate and distribute the Estate's assets under the priorities established by the Bankruptcy Code. A discussion of what will happen in chapter 7 is set forth in Section XIV of this Disclosure Statement regarding "Liquidation Analysis and Best Interests Test." The Debtors believe that liquidation under chapter 7 would cause much smaller distributions being made to creditors than those provided for in the Plan.

**B.      Alternative Plan of Reorganization.**

If the Plan is not confirmed, the Debtors could propose a different plan. Such a plan might involve a reorganization and continuation of the Debtors' business, or an orderly liquidation of the Debtors' assets. Prior to the Petition Date, the Debtors explored various alternatives to transactions contemplated by the Plan. The Debtors believe that the Plan enables creditors to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended time than a liquidation under chapter 7, possibly resulting in somewhat greater, but indeterminate, recoveries than would be obtained in chapter 7. Given the current economic climate in the oil and gas industry, an orderly liquidation would yield a higher sale prices and achieve a better result that a chapter 7 liquidation. An orderly liquidation would also minimize professional fees and administrative costs due to the knowledge held by the Debtors' managers and their professionals.

**C.      Dismissal.**

Dismissal of the Cases will leave each creditor or Party with its non-bankruptcy claims and rights subject to the Claims and rights of each other creditor and party.

**XVIII.**
**TAX CONSEQUENCES OF THE PLAN**

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN MAY HAVE TAX AND SECURITIES LAW IMPLICATIONS. HOLDERS OF THE CLAIMS AND INTERESTS ARE URGED TO OBTAIN INDEPENDENT ADVICE FROM THEIR OWN COUNSEL REGARDING THE APPLICABILITY OF FEDERAL AND STATE TAX AND SECURITIES LAWS.

THE FOREGOING SUMMARY OF THE PLAN DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF EACH HOLDER'S PARTICULAR CIRCUMSTANCES AND INCOME TAX SITUATION. HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO BE RELIED

43

UPON AND CANNOT BE RELIED UPON BY ANY HOLDER FOR ANY PURPOSE; (B) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS INCLUDED IN CONNECTION WITH THE PLAN ONLY; AND (C) EACH HOLDER OF A CLAIM OR INTEREST SHOULD SEEK ADVISE FROM AN INDEPENDENT TAX ADVISOR.

The federal income tax consequences of the Plan to holders of Claims and Interests will depend on among other things: the origin of each holder's Claim or Interest, when the Claim becomes an Allowed Claim, when the holder receives a payment on account of an Allowed Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction regarding the Claim or Interest, and whether the Claim or Interest constitutes a "security" for federal income tax purposes.

**THE FOREGOING IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE FROM INDEPENDENT TAX PROFESSIONALS. HOLDERS OF CLAIMS AND INTEREST ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

## XIX.
## RECOMMENDATION AND CONCLUSION

The Debtors believe that the Plan provides the greatest possible recovery for creditors and equity interest holders and acceptance of the Plan is in the best interest of all parties. Any alternative would cause a reduced recovery to holders of Claims, delay, uncertainty, and expense. The Debtors urge holders of Impaired Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in this Disclosure Statement, the Plan, and on their Ballots.

Dated October 24, 2016.                **D.J. SIMMONS COMPANY LIMITED PARTNERSHIP**

By: /s/ Rodney L. Seale
Its: President of General Partner, D.J. Simmons, Inc.

**D.J. SIMMONS, INC.**

By: /s/ Rodney L. Seale
Its: President

**KIMBETO RESOURCES, LLC**

By: /s/ Rodney L. Seale
Its: President of General Partner, D.J. Simmons, Inc.

44